Hannah Stone, Esq.
Alyssa L. Campbell, Esq.
MILODRAGOVICH, DALE &
    STEINBRENNER, P.C.
620 High Park Way ▪ P.O. Box 4947
Missoula, MT 59806-4947
hstone@bigskylawyers.com;
acampbell@bigskylawyers.com
*Attorneys for Proposed Intervenors-*
    *Defendants Sportsmen's Alliance*
    *Foundation, Safari Club*
    *International, and Rocky Mountain*
    *Elk Foundation*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### MISSOULA DIVISION

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, et al, | **Lead Case 9:24-cv-00043-DWM** |
| Plaintiffs, | Member Case 9:24-cv-00044-DWM |
| and | |
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Consolidated Plaintiffs, | |
| v. | **PROPOSED INTERVENORS-DEFENDANTS SPORTSMEN'S ALLIANCE FOUNDATION, SAFARI CLUB INTERNATIONAL, AND ROCKY MOUNTAIN ELK FOUNDATION'S BRIEF IN SUPPORT OF MOTION TO INTERVENE** |
| UNITED STATES FISH AND WILDLIFE SERVICE, et al., | |
| Defendants, | |
| and | |
| SPORTSMEN'S ALLIANCE FOUNDATION, SAFARI CLUB INTERNATIONAL, and ROCKY MOUNTAIN ELK FOUNDATION, | |
| Proposed Intervenors-Defendants. | |

**PROPOSED INTERVENORS-DEFENDANTS'
BRIEF IN SUPPORT OF MOTION TO INTERVENE**
12231.004

# TABLE OF CONTENTS

I.     BACKGROUND................................................................. 1

     A.     Gray Wolf Recovery in the Northern Rocky Mountains. ............................. 1

     B.     Background on Proposed Intervenors. ........................................... 5

II.     ARGUMENT ................................................................... 8

     A.     Hunting Intervenors Should be Granted Intervention as of Right. ............... 8

         1. The Motions are Timely............................................................ 9

         2. Hunting Intervenors Have Significant Protectable Interests in the Subject Matter of This Litigation....................................... 10

         3. Disposition of These Cases Will Impair Hunting Intervenors' Ability to Protect their Interests. ................................................ 13

         4. Existing Defendants Do Not Adequately Represent Hunting Intervenors' Interests........................................................ 17

             a. Existing Defendants Will Not Make the Same Arguments and Hunting Intervenors Add a Necessary Element to These Cases...... 17

             b. There is No Presumption that the Existing Parties Adequately Represent Hunting Intervenors. ....................................... 20

     B.     Alternatively, Hunting Intervenors Should Be Granted Permissive Intervention. ................................................................ 25

III.     CONCLUSION ............................................................... 27

# TABLE OF AUTHORITIES

## Cases

All. for the Wild Rockies v. Kimbell, No. 06-cv-63, 2006 WL 8430428
(D. Mont. Aug. 7, 2006) ................................................................ 26, 27

All. for the Wild Rockies v. Salazar, 800 F. Supp. 2d 1123 (D. Mont. 2011)
*aff'd*, 672 F.3d 1170 (9th Cir. 2012)....................................................... 3, 13

Californians for Safe & Competitive Dump Truck Transp. v. Mendonca,
152 F.3d 1184 (9th Cir. 1998) ................................................................. 20

Beckman Indus., Inc. v. Int'l Ins. Co., 966 F.2d 470 (9th Cir. 1992) ............................... 25

Berger v. N.C. State Conf. of the NAACP, 597 U.S. 179 (2022)...................................... 21

Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc., 54 F.4th 1078
(9th Cir. 2022)............................................................................... 10

Cal. v. U.S. EPA, No. 18-cv-3237, 2018 WL 6069943
(N.D. Cal. Nov. 20, 2018).................................................................. 25, 27

Callahan v. Brookdale Sr. Living Cmties, Inc., 42 F.4th 1013 (9th Cir. 2022).......... 21, 22

Citizens for Balanced Use v. Mont. Wilderness Ass'n, 647 F.3d 893
(9th Cir. 2011)........................................................................... passim

Cnty. of Fresno v. Andrus, 622 F.2d 436 (9th Cir. 1980)................................................. 10

Crow Indian Tribe v. U.S., No. 17-cv-89, 2017 WL 6327775
(D. Mont. Dec. 11, 2017).................................................................... 26

Ctr. for Biological Diversity v. Haaland, No. 20-cv-461 (D. Ariz. June 16, 2021).......... 18

Ctr. for Biological Diversity v. U.S. Forest Serv., No. 23-cv-110,
2024 WL 50888 (D. Mont. Jan. 4, 2024).............................................. 9, 11

Defs. of Wildlife v. Hall, 565 F. Supp. 2d 1160 (D. Mont. 2008) ..................................... 13

Defs. of Wildlife v. Jewell, 68 F. Supp. 3d 193 (D.D.C. 2014)......................................... 13

Defs. of Wildlife v. Salazar, 729 F. Supp. 2d 1207 (D. Mont. 2010) ........................... 2, 13

Defs. of Wildlife v. U.S. Fish & Wildlife Serv., No. 21-16382,
2022 WL 3656444 (9th Cir. Aug. 24, 2022) .............................. 18, 23, 26

Defs. of Wildlife v. U.S. Fish & Wildlife Serv., No. 21-cv-344
    (N.D. Cal. May 6, 2021) ............................................................... 18

Defs. of Wildlife v. Zinke, 849 F.3d 1077 (D.C. Cir. 2017)......................................... 3, 13

Desert Prot. Soc'y v. Bernhardt, No. 2:19-cv-00198, 2020 WL 1307189
    (E.D. Cal. Mar. 19, 2020) ............................................................ 19

Forest Conservation Council v. U.S. Forest Serv., 66 F.3d 1489 (9th Cir. 1995) ...... 20, 22

Friends of Animals v. Bernhardt, 961 F.3d 1197 (D.C. Cir. 2020) ................................... 18

Helena Hunters & Anglers Ass'n v. Martin, No. 19-cv-47, 2019 WL 4043948
    (D. Mont. Aug. 27, 2019) ............................................................ 25

Humane Soc'y of the U.S. v. Jewell, 76 F. Supp. 3d 69 (D.D.C. 2014)............................ 13

Humane Soc'y of the U.S. v. Kempthorne, 579 F. Supp. 2d 7 (D.D.C. 2008)................. 13

Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392 (9th Cir. 1995) ................................ 11

Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094 (9th Cir. 2002) ....................... 25, 26

Mont. Pub. Int. Rsch. Grp. v. Jacobsen, No. 23-cv-70, 2024 WL 197364
    (D. Mont. Jan. 18, 2024) ............................................................ 24

Mont. Wildlife Fed'n v. Haaland, No. 20-35793, 2022 WL 42794
    (9th Cir. Jan. 5, 2022) ............................................................... 24

Nuesse v. Camp, 385 F.2d 694 (D.C. Cir. 1967) ............................................................... 10

Oakland Bulk & Oversized Terminal, LLC v. City of Oakland, 960 F.3d 603
    (9th Cir. 2020)......................................................................... 8

Perry v. Schwarzenegger, 630 F.3d 898 (9th Cir. 2011).................................................... 25

Pub. Emps. for Envtl. Resp. v. Bernhardt, No. 18-cv-1547, 2020 WL 601783
    (D.D.C. Feb. 7, 2020) ................................................................ 18

Rock Creek All. v. U.S. Fish & Wildlife Serv., No. 08-cv-28, 2008 WL 11350203
    (D. Mont. Apr. 4, 2008) .............................................................. 9

Sagebrush Rebellion, Inc. v. Watt, 713 F.2d 525 (9th Cir. 1983) ..................................... 11

Sierra Club v. U.S. EPA, 995 F.2d 1478 (9th Cir. 1993).................................................... 11

Stevens Cnty. v. U.S. Dep't of Interior, No. 06-cv-156, 2006 WL 8438084
(E.D. Wash. Oct. 4, 2006) .......................................................... 19

Sw. Ctr. for Biological Diversity v. Berg, 268 F.3d 810 (9th Cir. 2001) ................. passim

Trbovich v. United Mine Workers of Am., 404 U.S. 528 (1972) ...................................... 17

U.S. v. City of Los Angeles, 288 F.3d 391 (9th Cir. 2002) ............................................... 10

U.S. v. Or., 839 F.2d 635 (9th Cir. 1988) ........................................................................ 16

W. Watersheds Project v. Haaland, 22 F.4th 828 (9th Cir. 2022) .......................... 8, 17, 19

W. Watersheds Project v. U.S. Fish & Wildlife Serv., No. 4:10-CV-229-BLW,
2011 WL 2690430 (D. Idaho Feb. 2, 2012) ...................................................... 17, 21

WildEarth Guardians v. Nat'l Park Serv., 604 F.3d 1192 (10th Cir. 2010) ..................... 16

Wilderness Soc'y v. U.S. Forest Serv., 630 F.3d 1173 (9th Cir. 2011) ................ 11, 20, 25

Yuba River Citizens League v. Nat'l Marine Fisheries Serv., No. 06-cv-2845,
2007 WL 3034887 (E.D. Cal. Oct. 16, 2007). ............................................................ 23

## Statutes

Idaho Code §§ 36-408(1), 36-409(a)-(c) ......................................................................... 12

Mont. Code Ann. §§ 87-2-523(1), 87-2-524(1) ............................................................... 12

Wyo. Stat. Ann. §§ 23-1-302(a)(xxix), 23-3-102(a) ........................................................ 12

## Rules

Fed. R. Civ. P. 24(a) ......................................................................................................... 8

## Treatises

7C C.A. Wright & A.R. Miller, Federal Practice and Procedure § 1908.2
(3d ed. Apr. 2023 update) .......................................................................................... 14

## Regulations

50 C.F.R. § 17.31(a) ......................................................................................................... 16

## Constitutional Provisions

Idaho Const. art. I, § 23 .................................................................................... 12

Mont. Const.. art. IX, § 7 ................................................................................. 12

Wyo. Const.. art. I, § 39 .................................................................................. 12

## Registers

43 Fed. Reg. 9607 (Mar. 9, 1978) ...................................................................... 1

59 Fed. Reg. 60252 ........................................................................................... 2

59 Fed. Reg. 60266 (Nov. 22, 1994) ................................................................. 2

74 Fed. Reg. 15123, 15124 (Apr. 2, 2009) ....................................................... 2

77 Fed. Reg. 55530 (Sept. 10, 2012) ................................................................ 3

86 Fed. Reg. 51857 ........................................................................................... 4

89 Fed. Reg. 8391, 8392 (Feb. 7, 2024) ........................................................... 3

89 Fed. Reg. at 8392 ......................................................................................... 4

89 Fed. Reg. at 8393-8394 ............................................................................ 4, 5

89 Fed. Reg. 23919 (Apr. 5, 2024) .................................................................. 16

## Codes

Administrative Procedure Act, 5 U.S.C. § 706 ................................................... 5

16 U.S.C. § 1533(f) ........................................................................................... 2

16 U.S.C. § 1538(a)(1)(B).............................................................................. 16

Pub. L. 112-10, 125 Stat. 38 (2011) ............................................................ 2, 24

# EXHIBITS

Declaration of Todd Adkins ............................................................... Exhibit A

Declaration of Steven P. Brock ....................................................... Exhibit B

Declaration of Travis Barton Bullock ............................................. Exhibit C

Declaration of William J. Finch ..................................................... Exhibit D

Declaration Rew R. Goodenow...................................................... Exhibit E

Declaration of Corey Jacobsen...................................................... Exhibit F

Declaration of Matt Lumley .......................................................... Exhibit G

Declaration of Paul Rossignol ....................................................... Exhibit H

Declaration of R. Kyle Weaver ...................................................... Exhibit I

Declaration of Terry J. Wiegand ................................................... Exhibit J

COMES NOW, Intervenor-Defendants Sportsmen's Alliance Foundation ("Sportsmen's Alliance"), Safari Club International ("Safari Club"), and Rocky Mountain Elk Foundation ("RMEF") (collectively, the "Hunting Intervenors") and files their brief in support of their Unopposed Motion to Intervene.

Gray wolves have been the subject of numerous removals from the Endangered Species Act's ("ESA") lists of endangered and threatened species, 16 U.S.C. §§ 1531-1544, that have prompted legal challenges. Hunting Intervenors have participated in most of those challenges, representing their own interests and the interests of their members who wish to hunt gray wolves during state-authorized hunting seasons, protect gray wolf prey populations, and responsibly manage predators. Hunting Intervenors once again seek to intervene in litigation to defend the status of gray wolves, which is under attack in Plaintiffs' Complaints.

## I.    BACKGROUND

### A.    Gray Wolf Recovery in the Northern Rocky Mountains.

Gray wolves (*Canis lupus*) were listed when the ESA was enacted in 1974 and were reclassified at the species level in 1978. 43 Fed. Reg. 9607 (Mar. 9, 1978). The U.S. Fish and Wildlife Service (the "Service") developed recovery plans for wolves in the Great Lakes and Northern Rocky Mountains ("NRM") -- areas that, at the time of recovery planning, contained wolves or demonstrated characteristics for quality wolf habitat. *See* 74 Fed. Reg. 15123, 15124 (Apr. 2,

2009) ("2009 Delisting Rule"); 16 U.S.C. § 1533(f). In 1994, the Service

designated two nonessential experimental gray wolf populations in the area around

Yellowstone National Park (Montana and Wyoming) and in Central Idaho. 59 Fed.

Reg. 60252 (Nov. 22, 1994); 59 Fed. Reg. 60266 (Nov. 22, 1994). In 1995, wolves

were translocated into these areas. They flourished. By 2000 -- five years after

reintroduction -- the NRM wolves exceeded numerical and distributional recovery

goals. By 2002, they had met all recovery criteria by exceeding the numerical and

distributional recovery goals for the third successive year. 74 Fed. Reg. at 15124.

In 2009, the Service established the NRM Distinct Population Segment

("DPS") of gray wolves. This DPS covered the States of Idaho, Montana, and

Wyoming, as well as the eastern third of Oregon and Washington, and a small part

of north-central Utah. 74 Fed. Reg. at 15123. The Service simultaneously removed

ESA protections for the NRM DPS, except for the Wyoming population, due to

their continued achievement of recovery metrics and findings that the ESA listing

factors were no longer met. This Court vacated the 2009 Delisting Rule. *Defs. of*

*Wildlife v. Salazar*, 729 F. Supp. 2d 1207 (D. Mont. 2010).

Before the appeal of that decision was completed, Congress passed and the

President signed an appropriations bill that directed the Service to reinstate the 2009

Delisting Rule. Pub. L. 112-10, 125 Stat. 38 (2011). The relevant section of the

appropriations act was challenged and upheld by this Court and the Ninth Circuit.

*All. for the Wild Rockies v. Salazar*, 800 F. Supp. 2d 1123 (D. Mont. 2011), *aff'd*,
672 F.3d 1170 (9th Cir. 2012). The Service then delisted Wyoming's wolves in a
separate rulemaking, 77 Fed. Reg. 55530 (Sept. 10, 2012), which was upheld by the
D.C. Circuit. *Defs. of Wildlife v. Zinke*, 849 F.3d 1077 (D.C. Cir. 2017). The
respective states have been managing their wolf populations -- including holding
legal hunts in Idaho, Montana, and Wyoming -- ever since their populations were
delisted.

In June and July 2021, the Service received two petitions to relist the gray
wolves in the NRM or alternatively in the Western States. 89 Fed. Reg. 8391, 8392
(Feb. 7, 2024). The first petition was submitted by the Center for Biological
Diversity and others (collectively "Center Plaintiffs"). It sought to list the gray
wolves in the NRM as a threatened or endangered species on an "emergency"
basis. *Id*. In the alternative, Center Plaintiffs asked the Service to create and list as
threatened or endangered a "Western DPS" of gray wolves in California, Colorado,
Idaho, Montana, Nevada, Oregon, Utah, Washington, and Wyoming, and
potentially in Arizona and New Mexico, north of Interstate 40. *Id*. Because the
ESA does not provide for emergency listings, the Service considered this petition
"under the normal process." *Id*.

The second petition was submitted by Western Watersheds Project and 70
other organizations ("Watershed Plaintiffs"). It similarly requested the listing of a

population of gray wolves in Western States including Arizona, California,

Colorado, Idaho, Montana, Nevada, Oregon, Utah, Washington, and Wyoming. *Id.*[1]

On September 17, 2021, the Service issued a 90-day finding on those

petitions and found, on the basis of the information provided in the petitions

themselves, the petitioned actions "may be warranted." 86 Fed. Reg. 51857. The

Service commenced a status review of gray wolves in these Western States and

opened a public comment period. *Id.* Sportsmen's Alliance submitted comments

and information in response.[2]

On February 7, 2024, the Service denied the petitions. Specifically, the

Service found that the NRM DPS no longer exists within those borders, because

wolves have spread west and no longer represent a discrete subpopulation. 89 Fed.

Reg. at 8393-8394. More importantly, the Service concluded that the proposed

Western DPS of gray wolves does not qualify as threatened or endangered under

the five factors in Section 4(a)(1) of the ESA. *Id.* at 8394-8395. The Service stated:

> Our analysis of the current condition of gray wolves in
> the Western United States demonstrates that, despite
> current levels of regulated harvest, lethal control, and
> episodic disease outbreaks, wolf abundance in the

---

[1] The Service received a third petition from International Wildlife Coexistence Network, a plaintiff in the lead case, and other organizations on March 1, 2022. The Service considered this petition along with the others because it had already issued the 90-day finding and commenced the status review. 89 Fed. Reg. at 8392.

[2] Available through Regulations.gov at https://www.regulations.gov/comment/FWS-HQ-ES-2021-0106-49520.

**PROPOSED INTERVENORS-DEFENDANTS' BRIEF IN
SUPPORT OF UNOPPOSED MOTION TO INTERVENE**             **PAGE 4**
12231.004

> Western United States has generally continued to increase and occupied range has continued to expand since reintroduction in the 1990s, with the exception of 3 years during which wolf abundance in the Western metapopulation decreased slightly (i.e., a decrease of approximately 50 to 100 wolves in 1 year). As of the end of 2022, States estimated that there were 2,797 wolves distributed among at least 286 packs in 7 States. This large population size and broad distribution contributes to the resiliency and redundancy of wolves in the Western United States.
>
> … Thus, after assessing the best available data, we conclude that the gray wolf in the Western United States is not in danger of extinction or likely to become so in the foreseeable future throughout all of its range.

*Id.* at 8395.

Plaintiffs now challenge the denial of their petitions, alleging that the Service's decision was arbitrary and capricious and not in accordance with the law under the ESA and the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"). Watershed Pls.' Compl. ¶¶ 192-204; Center Pls.' Compl. ¶¶ 131-158. The cases were consolidated on April 10, 2024. Doc. 10.

**B.    Background on Proposed Intervenors.**

Sportsmen's Alliance is an Ohio-based 501(c)(3) organization dedicated to promoting and educating the public about our hunting, fishing, and trapping heritage, and science-based wildlife management. Adkins Decl. ¶¶ 4-6. Sportsmen's Alliance achieves its mission through public education and issue

research conducted both on its own and through partnerships with local sportsmen and conservation organizations. *Id.* ¶¶ 6-7. It also engages in litigation "when necessary to protect the beneficial pursuits of hunting, trapping, fishing and scientific wildlife management practices." *Id.* ¶¶ 5-6. Sportsmen's Alliance "has organizational members, including [its parallel entity] U.S. Sportsmen's Alliance, whose membership consists of Individuals throughout the country, including the Northern Rocky Mountain region and the western states" who will be impacted by this litigation. *Id.* ¶ 9; Rossignol Decl. ¶¶ 5-17.

Safari Club is an I.R.C. § 501(c)(4) non-profit organization representing approximately 88,000 members and advocates around the world. Tens of thousands of Safari Club's members live or hunt in the states that comprise the NRM DPS or the Western DPS of gray wolves proposed by Plaintiffs. Goodenow Decl. ¶¶ 3-4. Safari Club has 147 Chapters worldwide and 32 Chapters in these same states. *Id.* ¶ 4. Safari Club's missions and purposes include the conservation of wildlife, protection of the hunter, and education of the public about hunting and its use as a conservation tool. *Id.* ¶ 7. Safari Club's advocacy focuses on the concept of sustainable use, which recognizes that the well-managed use of wildlife, including through regulated hunting, directly advances and incentivizes conservation. *Id.* ¶ 8. Safari Club has significant experience in litigation on wildlife

conservation and management issues, including cases involving the ESA status and management of gray wolves around the United States. *Id.* ¶¶ 9-10.

RMEF is a 501(c)(3) non-profit public-benefit corporation incorporated in Montana. Weaver Decl. ¶ 2. RMEF has thousands of hunter members in the states that host gray wolf populations that are the subject of these actions. *Id.* ¶ 3 (state-by-state detail). RMEF's mission is to ensure the future of elk (a commonly hunted species whose abundance is heavily influenced by predation by wolves), other wildlife, their habitat, and our hunting heritage. *Id.* ¶ 4; *see* Wiegland Decl. ¶¶ 5, 8-11; Jacobsen Decl. ¶¶ 8-12; Brock Decl. ¶¶ 6, 8-11. RMEF works to enhance and protect wildlife habitat and provides financial support to achieve those goals. Weaver Decl. ¶¶ 5-8. Since 1984, RMEF has permanently protected and enhanced more than 8.9 million acres of North America's most vital habitat for elk and other wildlife, much of which overlaps with gray wolf occupied territory. *Id.* ¶¶ 5-9 (details). The substantial sums and effort RMEF has invested in conservation work benefits the public at large, but its benefit to RMEF and its members will be diminished if wolf numbers increase, because of the resulting increased predation on elk and other huntable prey species. *Id.* ¶¶ 9, 14.[3]

---

[3] RMEF has participated in the development of state gray wolf management plans across the Northern Rocky Mountains, as well as prior wolf ESA litigation. Weaver Decl. ¶ 11. Specific to this, RMEF met with the Service in presenting opposition to

## II. ARGUMENT

### A. Hunting Intervenors Should be Granted Intervention as of Right.

The Court should grant Hunting Intervenors' Motions to Intervene because

all requirements of Fed. R. Civ. P. 24(a) are met. "Under Rule 24(a)(2), a nonparty

is entitled to intervention as of right when it '(i) timely moves to intervene; (ii) has

a significantly protectable interest related to the subject of the action; (iii) may

have that interest impaired by the disposition of the action; and (iv) will not be

adequately represented by existing parties.'" *W. Watersheds Project v. Haaland*,

22 F.4th 828, 835 (9th Cir. 2022) (quoting *Oakland Bulk & Oversized Terminal,*

*LLC v. City of Oakland*, 960 F.3d 603, 620 (9th Cir. 2020)). These elements are

interpreted "broadly in favor of intervention." *Id.* (citing *Citizens for Balanced Use*

*v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011)). The Court must

also accept nonconclusory allegations and evidence submitted in support of a

motion to intervene as true. *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810,

819–20 (9th Cir. 2001). Because these Motions are timely, Hunting Intervenors

have a strong interest in protecting their hunting opportunities for wolves and

ungulates, this interest will be impaired and hunting opportunities will be

foreclosed or diminished if Plaintiffs succeed, and the current defendants cannot

---

Plaintiffs' petitions to relist wolves and provided additional readily available information. *Id.*

adequately represent the interests of private organizations and hunter-conservationists, this Court should grant Hunting Intervenors' request to intervene as of right.

### 1.     The Motions are Timely.

The first element is satisfied because Hunting Intervenors' Motions were filed very soon after the Complaints, even before Federal Defendants' responsive pleadings are due. Courts routinely find intervention motions timely when filed within a few months of the plaintiff's complaint and the defendant's responsive pleading, or before any substantive developments in the case have occurred. *Citizens for Balanced Use*, 647 F.3d at 897 (finding motion to intervene as of right timely when filed less than three months after the complaint and less than two weeks after defendant's answer); *Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. 23-cv-110, 2024 WL 50888, at *2 (D. Mont. Jan. 4, 2024) ("because this case is in its early stages, and because the Parties have not yet engaged in any substantive proceedings, the application to intervene is timely and will not prejudice the existing Parties"); *Rock Creek All. v. U.S. Fish & Wildlife Serv.*, No. 08-cv-28, 2008 WL 11350203, *1 (D. Mont. Apr. 4, 2008) (finding motion to intervene as of right timely when filed before defendant filed its answer).

//

//

**PROPOSED INTERVENORS-DEFENDANTS' BRIEF IN**
**SUPPORT OF UNOPPOSED MOTION TO INTERVENE**                    **PAGE 9**
12231.004

The Motions are timely because they are filed within about one month after Plaintiffs filed their respective Complaints, and before the Federal Defendants' responsive pleadings.

### 2.     Hunting Intervenors Have Significant Protectable Interests in the Subject Matter of This Litigation.

The Motions should be granted because Hunting Intervenors and their members have significant protectable interests in hunting and responsibly managing wolves in accordance with state laws and outside the ESA's strictures. Rule 24(a)'s interest element does not present a high bar to intervention: it "is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Cnty. of Fresno v. Andrus*, 622 F.2d 436, 438 (9th Cir. 1980) (quoting *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967)). A proposed intervenor's interest need only be legally protectable and related to the claims at issue. *Id.* The interest does not necessarily need to be protected by the law at issue in the case but may be protected under another federal or state law. *See Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1088–89 (9th Cir. 2022). "The relationship requirement is met 'if the resolution of the plaintiff's claims actually will affect the applicant.'" *U.S. v. City of Los Angeles*, 288 F.3d 391, 398 (9th Cir. 2002) (citation omitted). The proposed intervenor will be affected when the

plaintiff's requested relief would compel an agency defendant to more restrictively regulate the proposed intervenor's activities. *See, e.g., Sierra Club v. U.S. EPA*, 995 F.2d 1478, 1484 (9th Cir. 1993), abrogated on other grounds by *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011); *Ctr. for Biological Diversity*, 2024 WL 50888, at *2 ("Companies that use public timber have 'a broader interest in any litigation that might impede their ability to obtain timber from federal lands in the future.'") (citations and alterations omitted).

The Ninth Circuit has repeatedly held that a non-governmental entity's conservation and recreational interests that may be affected by the litigation satisfy Rule 24(a)'s interest requirement. This is especially true where the litigant supported an agency action, which is then challenged by another party in court. *E.g., Citizens for Balanced Use*, 647 F.3d at 897-898; *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 528 (9th Cir. 1983); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995). In *Citizens for Balanced Use*, the Ninth Circuit found that wilderness-focused advocacy groups had a significant protectable interest in conserving and enjoying an area whose wilderness character would change if the plaintiff succeeded. 647 F.3d at 897. In *Idaho Farm Bureau*, the Ninth Circuit ruled that conservation groups that supported listing the Springs Snail as an endangered species "have an interest relating to the subject of the present litigation," because "[a] public interest group is entitled as a matter of right

to intervene in an action challenging the legality of a measure it has supported." 58 F.3d at 1397.

Here, Hunting Intervenors' and their members' interests are protected and authorized by state law, which secures the right to hunt and allows the wolf hunting that Hunting Intervenors support and in which their members wish to participate. *See e.g.,* Idaho Const. art. I, § 23; Mont. Const.. art. IX, § 7; Wyo. Const.. art. I, § 39; Idaho Code §§ 36-408(1), 36-409(a)-(c); Mont. Code Ann. §§ 87-2-523(1), 87-2-524(1); Wyo. Stat. Ann. §§ 23-1-302(a)(xxix), 23-3-102(a); Bullock Decl. ¶¶ 15-20; Finch Decl. ¶¶ 6, 10-11; Goodenow Decl. ¶¶ 12-13; Lumley Decl. ¶¶ 10-12; Wiegland Decl. ¶ 6; Rossignol Decl. ¶ 12-15. Thus, state laws authorize and convey the privilege to hunt wolves to Hunting Intervenors' members.

State laws also authorize and convey the privilege to hunt elk and other species that are prey to wolves, and that hunting interest is likewise diminished if States can no longer manage wolves and wolf numbers increase following an unwarranted ESA relisting, resulting in increased predation by wolves. Wiegand Decl. ¶¶ 5, 8-11; Jacobsen Decl. ¶¶ 8-12; Brock Decl. ¶¶ 6, 8-11; Weaver Decl. ¶¶ 9, 14. Further, RMEF has invested sums in land acquisitions, exchanges, conservation easements, and improving habitat quality through stewardship projects such as prescribed burns, forest thinning, weed treatments, planting native

vegetation, removing old barbed-wire fence, and installing wildlife-friendly
fencing, in an effort to enhance wildlife populations and conserve wildlife
generally. Weaver Decl. ¶¶ 5-8. The value of those investments to RMEF's
mission is diminished if their positive impact on the population of prey species is
lost to increased wolf predation. *Id.* ¶¶ 9, 14. Hunting Intervenors have significant
protectable interests in the cases.

### 3. Disposition of These Cases Will Impair Hunting Intervenors' Ability to Protect their Interests.

Further, Hunting Intervenors' and their members' significant protectable
interests in gray wolf conservation and state management of wolves will
unquestionably be affected if Plaintiffs succeed. Hunting Intervenors have been
granted intervention in at least eight separate cases challenging the delisting of
wolves, because Hunting Intervenors and their members enjoy and benefit from
wolves when delisted.[4] Their members have hunted wolves in the past and will
continue to do so in the future if the States continue to authorize it. Bullock Decl.
¶¶ 18-20; Finch Decl. ¶¶ 6, 11; Lumley Decl. ¶¶ 4, 12; Wiegland Decl. ¶ 6; Weaver
Decl. ¶ 14. But their members ***cannot*** hunt wolves or use hunting as a management

---

[4] Hunting Intervenors participated in the following cases. *Humane Soc'y of the U.S. v. Kempthorne*, 579 F. Supp. 2d 7 (D.D.C. 2008); *Defs. of Wildlife v. Hall*, 565 F. Supp. 2d 1160 (D. Mont. 2008); *Defs. of Wildlife*, 729 F. Supp. 2d 1207; *All. for the Wild Rockies v. Salazar*, 672 F.3d 1170 (9th Cir. 2012); *Defs. of Wildlife v. Zinke*, 849 F.3d at 1082; *Humane Soc'y of the U.S. v. Jewell*, 76 F. Supp. 3d 69, 75 n.2 (D.D.C. 2014); *Defs. of Wildlife v. Jewell*, 68 F. Supp. 3d 193 (D.D.C. 2014); *Defs. of Wildlife v. U.S. Fish & Wildlife Serv.* (and related cases), 584 F. Supp. 3d 812, 818 (N.D. Cal. 2022).

tool to protect prey populations like elk, deer, and moose, if wolves are relisted under the ESA. Further, Hunting Intervenors supported the downlisting or delisting of wolves for more than two decades. Most recently, Hunting Intervenors supported the very action challenged by Plaintiffs, and submitted comments in opposition to the petitions at issue. Accordingly, Hunting Intervenors satisfy the relationship requirement.

The third element is further satisfied because Plaintiffs' requested relief would shut down regulated wolf hunting, an activity that Hunting Intervenors seek to protect. The impairment requirement is satisfied, "as a general rule," if a proposed intervenor "would be substantially affected in a practical sense by the determination made in an action." *Sw. Ctr. For Biological Diversity*, 268 F.3d at 822 (internal quotation and citation omitted). To meet the impairment test, a proposed intervenor need only demonstrate that the plaintiff's requested relief will have "direct, immediate, and harmful effect[s]" on its interests. *Id*. at 818. Again, this bar is not high. "The rule is satisfied whenever disposition of the present action would put the movant at a practical disadvantage in protecting its interest." 7C C.A. Wright & A.R. Miller, Federal Practice and Procedure § 1908.2 (3d ed. Apr. 2023 update). Once courts find the proposed intervenor has a significant protectible interest in the case, they typically have "little difficulty concluding that the disposition of the case may, as a practical matter, affect it." *Citizens for*

*Balanced Use*, 647 F.3d at 898 (quoting *Cal. ex rel. Lockyer v. U.S.*, 450 F.3d 436, 442 (9th Cir. 2006)).

In *Citizens for Balanced Use*, wilderness advocacy organizations sought to intervene in a case brought by an advocacy organization to allow motorized access in a National Forest. 647 F.3d at 895-896. The district court denied the motion to intervene, and the Ninth Circuit reversed. *Id.* at 895. The Ninth Circuit found that the third element of Rule 24(a) was satisfied because the wilderness advocacy organizations' interest in conserving and enjoying wilderness would be impaired if the plaintiff prevailed and motorized uses in the forest increased. *Id.* at 898.

Here, a remand of the of the Service's decision denying the petitions to list a Western DPS of gray wolves would impair Hunting Intervenors' interests. Hunting Intervenors and their members wish to continue to hunt gray wolves and to properly manage this species to protect moose, deer, and elk. They have seen moose, deer, and elk populations decline as a result of the introduction of gray wolves into the NRM. Without hunting, their interests would be even more damaged due to even more diminished ungulate populations. *See e.g.,* Bullock Decl. ¶¶ 9-10; Finch Decl. ¶¶ 9-10; Lumley Decl. ¶¶ 5-12. Brock Decl. ¶¶ 9-11; Wiegand Decl. ¶¶ 5, 10; Jacobsen Decl. ¶¶ 8-9; Weaver Decl. ¶¶ 8-10, 14.[5] And,

---

[5] They have also lost revenues. Rossignol Decl. ¶¶ 8, 12-13.

as discussed above, investments in habitat improvement diminish in value if the enhancements in huntable prey-species populations they generate are lost due to wolf predation. In a practical sense, Hunting Intervenors' members' interests would be impaired if Plaintiffs succeed in returning Western wolves to federal protection. And as organizations, Hunting Intervenors' respective abilities to promote sustainable wildlife management, both of predators and prey, through hunting of gray wolves will be greatly diminished should Plaintiffs succeed. Goodenow Decl. ¶¶ 11-13; Weaver Decl. ¶¶ 9-14. For these reasons, Hunting Intervenors satisfy the third element of Rule 24(a). *Citizens for Balanced Use*, 647 F.3d at 898.[6]

//

//

---

[6] The third element is met even if additional administrative proceedings and future litigation are possible, because "persuasive stare decisis effect in any parallel or subsequent litigation" or proceedings will impair an intervenor's interest. *U.S. v. Or.*, 839 F.2d 635, 638 (9th Cir. 1988); *WildEarth Guardians v. Nat'l Park Serv.*, 604 F.3d 1192, 1199 (10th Cir. 2010) (citation omitted). A ruling by the Court striking down the Service's finding that listing is "not warranted" will surely narrow the Service's range of options on any remand, because it must obey the Court's ruling. *See, e.g.*, Center Pls.' Compl. ¶¶ 117-118 (asking Court to reject the Service's formula for calculating effective wolf population size and substitute Plaintiffs' proposed very different formula), ¶ 146 (seeking declaration that the Service has engaged in "an unlawful interpretation" of the statutory term "significant"). Once listing occurs, harm to Hunting Intervenors and their members is automatic. An endangered listing ends wolf hunting, and a threatened listing presumptively ends it. 16 U.S.C. § 1538(a)(1)(B); 89 Fed. Reg. 23919 (Apr. 5, 2024) (revising 50 C.F.R. § 17.31(a)). This results in an immediate loss of opportunities to hunt wolves, and in turn leads to increased predation on huntable prey species.

**4.    Existing Defendants Do Not Adequately Represent Hunting Intervenors' Interests.**

**a.    Existing Defendants Will Not Make the Same Arguments and Hunting Intervenors Add a Necessary Element to These Cases.**

The Motions should be granted because Federal Defendants do not adequately represent the interests of private hunting conservation organizations. A proposed intervenor's "burden of showing inadequacy of representation is 'minimal' and satisfied if the applicant can demonstrate that representation of its interests 'may be' inadequate." *W. Watersheds Project*, 22 F.4th at 840 (citation omitted); *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972). In determining the adequacy of existing representation, the court considers "(1) whether the interest of a present party is such that it will undoubtedly make all the intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether the would-be intervenor would offer any necessary elements to the proceedings that other parties would neglect." *Sw. Ctr. For Biological Diversity*, 268 F.3d at 822 (citation omitted).

The first factor weighs heavily in favor of granting intervention, because the existing Defendants will not "undoubtedly" make all Hunting Intervenors' arguments. Hunting Intervenors offer special expertise in hunting and conservation, which is more specific and detailed than Federal Defendants. *W. Watersheds*

*Project*, 22 F.4th at 841; see also *Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*, No.

21-16382, 2022 WL 3656444, at \*1 (9th Cir. Aug. 24, 2022) (reversing denial of

motion to intervene brought by agricultural and livestock interest groups in case

challenging gray wolf delisting due to court's failure to consider their special

expertise and its contribution to unique arguments); Adkins Decl. ¶¶ 7-8;

Goodenow Decl. ¶¶ 9-10. Moreover, Hunting Intervenors have a history of raising

procedural, jurisdictional, and other types of arguments that are typically not

addressed by Federal Defendants in similar cases.[7]

This history also demonstrates the unlikeliness that existing Defendants are

capable and willing to make all the same arguments under the second factor.

Hunting Intervenors and Federal Defendants have different interests, mandates,

and litigation strategies. These differences have played out repeatedly in other

cases in which Hunting Intervenors intervened, demonstrating that the second

factor weighs in favor of finding inadequacy of existing representation. *Accord*

*Stevens Cnty. v. U.S. Dep't of Interior*, No. 06-cv-156, 2006 WL 8438084, at \*3

---

[7] *See e.g.*, *Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1209 n.8 (D.C. Cir. 2020) (acknowledging and agreeing with Safari Club's argument that the plaintiffs did not properly plead a claim for relief); *Pub. Emps. for Env't Resp. v. Bernhardt*, No. 18-cv-1547, 2020 WL 601783, at \*3 (D.D.C. Feb. 7, 2020) (obtaining dismissal of plaintiffs' complaint due to lack of standing; the federal defendants did not challenge the court's jurisdiction); *Ctr. for Biological Diversity v. Haaland*, No. 20-cv-461, Dkt. 23 (D. Ariz. June 16, 2021) (Safari Club motion to dismiss challenging the injury prong of standing and raising the Act of State doctrine); *Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*, No. 21-cv-344, Dkt. 39 (N.D. Cal. May 6, 2021) (Safari Club Motion to Dismiss for Lack of Jurisdiction).

(E.D. Wash. Oct. 4, 2006) (finding the Service had to "weigh many competing interests, while Applicants' goals are focused more specifically on conservation issues. Therefore, it is probable that Applicants would make arguments different from those of the [Service]"). Moreover, Hunting Intervenors represent the interests of individual members -- such as hunting guides, outfitters, and ranchers -- with specific economic and other interests that are well outside the Service's purview. *See e.g.*, Bullock Decl. ¶¶ 18-19; Rossignol Decl. ¶¶ 8, 12-13. The "Federal [Government] Defendants cannot be expected to protect" those "economic and commercial interests" and it is reasonable to conclude that Hunting Intervenors "may take different positions" during the litigation. *Desert Prot. Soc'y v. Bernhardt*, No. 2:19-cv-00198, 2020 WL 1307189, at *2 (E.D. Cal. Mar. 19, 2020).

The third factor also weighs in favor of intervention, because Hunting Intervenors offer a necessary element that would otherwise be neglected -- the perspective of hunters who will be harmed if Plaintiffs succeed. *Accord W. Watersheds Project*, 22 F.4th at 842 (reversing denial of motion to intervene in part because proposed intervenor "actually participated" in the challenged conduct, unlike the existing parties).

Hunting Intervenors will offer an important differing viewpoint in this litigation. Nothing ensures that arguments involving wolf hunting and hunting to

protect prey populations (as well as other arguments) will be before the Court

unless Hunting Intervenors are allowed to intervene. Federal Defendants do not

and cannot present the sole perspective of hunters since they are government

regulators who must represent a constituency of diverse interests -- including those

who disagree with hunting. Federal Defendants must "represent a broader view

than the more narrow, parochial interests of" Hunting Intervenors and their

members, making this a case in which inadequate representation "is most likely to

be found." *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1499

(9th Cir. 1995), abrogated on other grounds by *Wilderness Soc'y*, 630 F.3d 1173;

*see also Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*,

152 F.3d 1184, 1190 (9th Cir. 1998) (holding that union's interests were not

adequately represented by government defendants because union's interests were

narrower and more parochial than those of the public at large, represented by the

government). All three factors demonstrate that the existing parties do not

adequately represent Hunting Intervenors' interests.

### b. There is No Presumption that the Existing Parties Adequately Represent Hunting Intervenors.

The Ninth Circuit historically held that a presumption of adequacy arose in

cases where the proposed intervenor and an existing party had the "same ultimate

objective." *Callahan v. Brookdale Sr. Living Cmties, Inc.*, 42 F.4th 1013, 1021 n.5

(9th Cir. 2022). In *Callahan*, the Ninth Circuit pointed to a recent Supreme Court case that "call[ed] into question" the propriety of such a presumption, and therefore the Circuit expressly declined to apply the presumption. *Id.* (citing *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179 (2022)).

If the Ninth Circuit is not going to apply the presumption, then this Court should not, either. Hunting Intervenors nevertheless overcome it. Seeking the same ruling (i.e., dismissal of the complaints) does not mean that Hunting Intervenors and existing Defendants share the same ultimate objective. *Citizens for Balanced Use*, 647 F.3d at 899. Where the proposed intervenor and agency defendants may defend the agency decision on different grounds, and have different "points of view," no presumption of adequacy arises. *Id.*; *see also W. Watersheds Project v. U.S. Fish & Wildlife Serv.*, Case No. 4:10-CV-229-BLW, 2011 WL 2690430, at *4 (D. Idaho Feb. 2, 2012) (finding that, even though both the proposed intervenor and the Service sought to affirm the challenged decision, their ultimate objectives differed because the applicants sought "to prevent, or at least delay as long as possible the effects of the [ESA] listing," while the Service "simply seeks confirmation of its administrative process"). Here, although both Hunting Intervenors and Federal Defendants seek to uphold the Service's decision, their objectives differ based on their reasons for doing so and the scope of their ultimate goals. Hunting Intervenors and their members seek to maintain state authority to

manage gray wolves and to continue to legally harvest wolves beyond the course of the litigation, while Federal Defendants seek to uphold the Service's decisions. The parties' ultimate objectives differ.

For the same reasons, Hunting Intervenors do not share an "identical" interest with one of the existing parties, which would need to be overcome with a compelling showing of inadequate representation. *Callahan*, 42 F.4th at 1020-1021 (internal quotation and citation omitted). Hunting Intervenors' interests are opposed to Plaintiffs' interests. Their interests are also not "identical" to the existing Defendants' interests. Again, those agencies are charged with representing the public, while Hunting Intervenors' interests are "more narrow, parochial," and personal to their pro-hunting members. *See e.g., Forest Conservation Council*, 66 F.3d at 1499; *Citizens for Balanced Use*, 647 F.3d at 899.

Finally, even if a presumption of adequate representation were to apply, it can be rebutted through a compelling showing that the proposed intervenor's interests are not "sufficiently congruent" with the parties' interests. *Sw. Ctr. For Biological Diversity*, 268 F.3d at 823. Existing parties and proposed intervenors do not have sufficiently congruent interests where (1) their motivations in defending the federal action differ, see *Id.*; or (2) where the proposed intervenor's interests "might diverge" from that of existing parties. S. *Yuba River Citizens League v.*

*Nat'l Marine Fisheries Serv.*, No. 06-cv-2845, 2007 WL 3034887, *14 (E.D. Cal. Oct. 16, 2007).

As explained above, Hunting Intervenors' motivations are not congruent with Federal Defendants. Hunting Intervenors' motivations are keyed to protecting hunting and responsible predator-prey management, which differs significantly from Federal Defendants' administrative motivations for defending the Service's finding. *See Defs. of Wildlife*, 2022 WL 3656444, at *1 (finding neither the Service nor hunting intervenors in that case adequately represented agricultural interests, due to their specific interest in ensuring the protection of livestock from gray wolves and obtaining compensation for livestock losses). Further, it is more than possible that Hunting Intervenors' litigation strategy "might diverge" from Federal Defendants. Hunting Intervenors seek to protect state management of gray wolves and hunting opportunities, for wolves as well as wolf prey. Hunting Intervenors likely have a different view of state regulations for hunting and managing gray wolves than the Service.[8] It is possible that Federal Defendants would take positions with respect to state regulatory mechanisms that diverge greatly from

---

[8] For example, Federal Defendant Deb Haaland, Secretary of the Interior, previously characterized some Western states' wolf management laws as "promoting precipitous reductions in wolf populations." *See* Interior Press Release, Feb. 7, 2022, available at https://www.doi.gov/pressreleases/secretary-haaland-wolves-have-walked-us-centuries-states-are-weakening-their. Hunting Intervenors but not Federal Defendants can be expected to fully plumb the record for evidence contrary to Plaintiffs' claims of precipitous drops in wolf populations.

Hunting Intervenors' positions. Further, Federal Defendants have little incentive to limit their own range of authority by contending that the appropriations act directing the reinstatement of the 2009 Delisting Rule has continuing relevance to the determination of whether the relevant wolves can or should be relisted. Pub. L. 112-10, 125 Stat. 38 (2011). Hunting Intervenors have that incentive.

This is sufficient to rebut any presumption of adequate representation. And for the foregoing reasons, Hunting Intervenors have satisfied the factors to demonstrate that existing Defendants do not adequately represent their interests in these cases.

\*   \*   \*

Hunting Intervenors have satisfied all four elements for intervention as of right. But there is one more practical consideration that favors intervention. Because of the "importance of the issues at stake, it is preferable to err on the side of more information, not less," and to grant intervention. *Mont. Pub. Int. Rsch. Grp. v. Jacobsen*, No. 23-cv-70, 2024 WL 197364, at \*5 (D. Mont. Jan. 18, 2024) (citation omitted); see also *Mont. Wildlife Fed'n v. Haaland*, No. 20-35793, 2022 WL 42794, at \*2 (9th Cir. Jan. 5, 2022) (not precedential) (holding that "practical considerations" weighed in favor of granting intervention because the proposed intervenor held leasehold interests that were threatened by the plaintiff's suit). The Court should therefore grant Hunting Intervenors' Motions to Intervene as of right.

**B.   Alternatively, Hunting Intervenors Should Be Granted Permissive Intervention.**

In the alternative, Hunting Intervenors respectfully request leave to intervene permissively under Federal Rule of Civil Procedure 24(b). Courts allow permissive intervention in cases where the proposed intervenor (1) timely moves to intervene and (2) raises a claim or defense that shares common questions of law or fact with the main case. *See e.g., Helena Hunters & Anglers Ass'n v. Martin*, No. 19-cv-47, 2019 WL 4043948, at *1 (D. Mont. Aug. 27, 2019) (citing *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 473 (9th Cir. 1992)). Permissive intervention is proper when the proposed intervenor's participation will "assist the court in its orderly procedures leading to the resolution of this case, which [will] impact[ ] large and varied interests." *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1111 (9th Cir. 2002), abrogated on other grounds by *Wilderness Soc'y*, 630 F.3d 1173. Courts have also permitted intervention where equitable considerations weigh in its favor. *See e.g., Cal. v. U.S. EPA*, No. 18-cv-3237, 2018 WL 6069943, at *4 (N.D. Cal. Nov. 20, 2018) (granting intervention where party's participation "will likely contribute 'to the just and equitable adjudication of the legal questions presented'") (quoting *Perry v. Schwarzenegger*, 630 F.3d 898, 905 (9th Cir. 2011)); *All. for the Wild Rockies v. Kimbell*, No. 06-cv-63, 2006 WL 8430428, *1 (D. Mont. Aug. 7,

2006) (granting permissive intervention to a party "whose interests are substantially affected" by the outcome of the case).

First, as explained above, the Motions are timely. Intervention will not unduly delay or prejudice the parties given the preliminary stages of these cases and the absence of any substantive decisions or briefing. *See, e.g., Crow Indian Tribe v. U.S.*, No. 17-cv-89, 2017 WL 6327775, at *2 (D. Mont. Dec. 11, 2017) (granting Safari Club's motion to intervene under Rule 24(b) when filed in the early stages of the case).

Second, Hunting Intervenors' defenses are directly responsive to Plaintiffs' claims. A proposed intervenor satisfies the commonality standard by "assert[ing] defenses of the [challenged party action] directly responsive to the claims … asserted by plaintiffs." *Kootenai Tribe of Idaho*, 313 F.3d at 1110. Hunting Intervenors seek to defend the Service's denials of Plaintiffs' petitions based on their information and experience, including experience with regulatory mechanisms involving regulated harvest of wolves specifically at issue in Plaintiffs' petitions. Hunting Intervenors' defenses can help support the Service's challenged decisions. As in *Defs. of Wildlife*, another case involving gray wolves, specialized knowledge of issues related to gray wolf management supports a grant of permissive intervention. 2022 WL 3656444, at *1.

Finally, equitable considerations weigh in favor of granting permissive intervention to Hunting Intervenors. Hunting Intervenors' members will be substantially harmed if Plaintiffs succeed in vacating and remanding the Service's denials of Plaintiffs' petitions. Hunting Intervenors have extensive experience with ESA and APA litigation and defending the unique interests and perspectives of hunting as a wildlife management tool and heritage pastime. For these reasons, their participation will contribute to the just and equitable adjudication of these cases and protect the interests of their individual members. *Cal. v. U.S. EPA*, 2018 WL 6069943, at \*4; *All. for the Wild Rockies v. Kimbell*, CV-06-63, 2006 WL 8430428, at \*1 (D. Mont. Aug. 7, 2006).  Accordingly, the Court should grant permissive intervention if it denies intervention as of right.

### III.   CONCLUSION

For the foregoing reasons, Hunting Intervenors respectfully request that the Court grant their Motions to Intervene as of right or permissively in these cases.

DATED this 10th day of May, 2024.

By_____
    Hannah Stone

*Attorneys for Proposed Intervenors-Defendants*
*Sportsmen's Alliance Foundation, Safari Club*
*International, and Rocky Mountain Elk*
*Foundation*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(d)(2)(E), I certify that this **Proposed Intervenors-Defendants Sportsmen's Alliance Foundation Safari Club International, and Rocky Mountain Elk Foundation Brief in Support of Motion to Intervene** is printed with proportionately spaced Times New Roman text typeface of 14 points; is double-spaced; and the word count, calculated by Microsoft Office Word 365, is 6,326 words long, excluding caption, certificate of compliance, table of contents and authorities, exhibit index, and any certificate of service.

By_____
        Hannah Stone

*Attorneys for Proposed Intervenors-Defendants Sportsmen's Alliance Foundation, Safari Club International, and Rocky Mountain Elk Foundation*

## CERTIFICATE OF SERVICE

I, the undersigned, of Milodragovich, Dale & Steinbrenner, PC, Attorneys for Proposed Intervenor-Defendants Sportsmen's Alliance Foundation, Safari Club International, and Rocky Mountain Elk Foundation, hereby certify that on this 10th day of May, 2024, a copy of the foregoing document was served on the following persons by the following means:

| 1-6 | Mail |
| --- | Overnight Delivery |
| 1-6 | E-mail |

1.  Kelly E. Nokes
    WESTERN ENVIRONMENTAL LAW CENTER - COLORADO
    P.O. Box 218
    Buena Vista, CO 81211
    nokes@westernlaw.org

    Attorneys for Plaintiffs Western Watersheds Project, International Wildlife
    Coexistence Network, WildEarth Guardians, Nimiipuu Protecting the Earth,
    Alliance for the Wild Rockies, Friends of the Clearwater, Wilderness Watch,.
    Predator Defense, Trap Free Montana, Protect the Wolves

2.  Sarah K. McMillan
    WESTERN ENVIRONMENTAL LAW CENTER
    103 Reeder's Alley
    Helena, MT 59601
    mcmillan@westernlaw.org

    Attorneys for Plaintiffs Western Watersheds Project, International Wildlife
    Coexistence Network, WildEarth Guardians, Nimiipuu Protecting the Earth,
    Alliance for the Wild Rockies, Friends of the Clearwater, Wilderness Watch,.
    Predator Defense, Trap Free Montana, Protect the Wolves

3.  Kristine Marie Akland
    AKLAND LAW FIRM, PLLC
    317 E. Spruce St. * PO Box 7274
    Missoula, MT 59807
    kakland@biologicaldiversity.org

    Attorneys for Consolidated Plaintiffs Center for Biological Diversity, Humane
    Society of the United States, Humane Society Legislative Fund, Sierra Club

4.    Collette L. Adkins
      CENTER FOR BIOLOGICAL DIVERSITY - CIRCLE PINES
      P.O. Box 595
      Circle Pines, MN 55014-0595
      cadkins@biologicaldiversity.org

      Attorneys for Consolidated Plaintiffs Center for Biological Diversity, Humane
      Society of the United States, Humane Society Legislative Fund, Sierra Club

5.    Margaret Ellen Robinson
      HUMANE SOCIETY OF THE UNITED STATES
      1255 23rd St NW, Suite 450
      Washington, DC 20037
      mrobinson@humanesociety.org

      Attorneys for Consolidated Plaintiffs Center for Biological Diversity, Humane
      Society of the United States, Humane Society Legislative Fund, Sierra Club

6.    Astrid Stuth Cevallos
      Environment & Natural Resources Division
      Wildlife & Marine Resources Section
      U.S. DEPARTMENT OF JUSTICE
      150 M St NE
      Washington, D.C. 20002
      astrid.cevallos@usdoj.gov

      Attorneys for Defendants Martha Williams, in her official capacity as Director of
      the U.S. Fish and Wildlife Service; United States Fish and Wildlife Service; Deb
      Haaland, in her official capacity as Secretary of the Interior; and United States
      Department of the Interior

                                    Kari Walker

Hannah Stone, Esq.
Alyssa L. Campbell, Esq.
MILODRAGOVICH, DALE &
    STEINBRENNER, P.C.
620 High Park Way ▪ P.O. Box 4947
Missoula, MT 59806-4947
hstone@bigskylawyers.com;
acampbell@bigskylawyers.com
*Attorneys for Proposed Intervenors-*
    *Defendants Sportsmen's Alliance*
    *Foundation, Safari Club*
    *International, and Rocky Mountain*
    *Elk Foundation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, et al, | **Lead Case 9:24-cv-00043-DWM** |
| Plaintiffs, | Member Case 9:24-cv-00044-DWM |
| and | |
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Consolidated Plaintiffs, | |
| v. | **DECLARATION OF TODD ADKINS IN SUPPORT OF SPORTSMEN'S ALLIANCE FOUNDATION'S MOTION TO INTERVENE** |
| UNITED STATES FISH AND WILDLIFE SERVICE, et al., | |
| Defendants, | |
| and | |
| SPORTSMEN'S ALLIANCE FOUNDATION, SAFARI CLUB INTERNATIONAL, and ROCKY MOUNTAIN ELK FOUNDATION, | |
| Proposed Intervenors-Defendants. | |



EXHIBIT
A

**DECLARATION OF TODD ADKINS IN SUPPORT OF**
**SPORTSMEN'S ALLIANCE FOUNDATION'S MOTION TO INTERVENE      PAGE 1**
12231.004

I, Todd Adkins, depose and state as follows:

1.      I am the Vice President of Governmental Affairs at the Sportsmen's Alliance Foundation, a Defendant-Intervenor applicant in these consolidated cases. I am over 18 years of age. I am authorized to speak and testify on behalf on behalf of the Sportsmen's Alliance Foundation as to the matters set forth in this Declaration. I make this Declaration in support of Sportsmen's Alliance Foundation's intervention in these consolidated cases.

2.      I have personal knowledge of the matters set forth in this Declaration, except those stated on information and belief, as to those matters, I believe them to be true.

3.      I have served as the Vice President of Governmental Affairs of Sportsmen's Alliance Foundation since late 2021. Through this role, I am familiar with Sportsmen's Alliance Foundation's mission and operations, as well as its involvement representing its members' interests in prior litigation and related matters. I am also familiar with its parallel entity, U.S. Sportsmen's Alliance's mission and operations.

4.      Sportsmen's Alliance Foundation is a national, 501(c)(3) nonprofit organization. It is incorporated in the state of Ohio and is headquartered in Columbus, Ohio. U.S. Sportsmen's Alliance is a national, 501(c)(4) nonprofit organization that is also incorporated in Ohio and headquartered in Columbus.

5.      Sportsmen's Alliance Foundation issues memberships in accordance with Article I, Section 5 of its Bylaws.

6.      In accordance with Article I Section 6 of its Bylaws, Sportsmen's Alliance Foundation's purposes are to (1) "develop and provide information on wildlife resources, field sports and conservation programs that will benefit such resources, sports and programs;" (2) "educate the public concerning the American heritage of hunting, trapping and fishing;" (3) "initiate and participate in litigation in the courts when necessary to protect the beneficial pursuits of hunting, trapping, fishing and scientific wildlife management practices;" (4) "promote and explain field sports, wildlife conservation, and scientific wildlife management practices through … communication channels;" and (5) "provide to organizations in the states … financial and management assistance and programs to achieve these purposes."

7.      Sportsmen's Alliance Foundation achieves its mission through, among other things, public education, issue research, and participation in legal proceedings that affect hunting, trapping, fishing, and wildlife management. The U.S. Sportsmen's Alliance participates in legislative and political activities related to the same issues.

8.      Sportsmen's Alliance Foundation works with multiple local sportsmen and conservation organizations dedicated to protecting the heritage of America's sportsmen and sportswomen to hunt, fish, and trap. Sportsmen's Alliance Foundation supports professional wildlife management, science-based decision-making, and traditional state primacy regarding fish and wildlife management.

9.      The U.S. Sportsman's Alliance is an organizational member of Sportsmen's Alliance Foundation. The U.S. Sportsmen's Alliance's membership consists of individuals and organizations throughout the country, including the Northern Rocky Mountain region and the western states.

10.     Sportsmen's Alliance Foundation is confident that the wolves in the Northern Rocky Mountain region—and throughout the lower 48 states—have recovered and will remain recovered for the foreseeable future.

11.     Sportsmen's Alliance Foundation met with U.S. Fish and Wildlife Service ("Service") officials to voice their opposition to the petition filed by the Center for Biological Diversity plaintiffs, which is at issue in the Member Case, in July of 2021. Sportsmen's Alliance Foundation followed up by submitting documents to the Service in August of 2021, and then submitted comments in opposition to both of the petitions at issue in these cases when the Service requested information in September of 2021. 86 Fed. Reg. 51857 (Sept. 17, 2021). Those comments are available at https://www.regulations.gov/comment/FWS-HQ-ES-2021-0106-49520.

12.     On information and belief, Sportsmen's Alliance Foundation, through its organizational members, has individual members who have and will continue to legally hunt and trap wolves in the Northern Rocky Mountain region. Those members will no longer be able to do that if the Plaintiffs in either case are ultimately successful in getting the wolves in the Northern Rocky Mountain region or the Western United States region relisted under the Endangered Species Act.

**DECLARATION OF TODD ADKINS IN SUPPORT OF**
**SPORTSMEN'S ALLIANCE FOUNDATION'S MOTION TO INTERVENE        PAGE 3**

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 3 day of May 2024 in Columbus, Ohio.

Todd Adkins

Hannah Stone, Esq.
Alyssa L. Campbell, Esq.
MILODRAGOVICH, DALE &
    STEINBRENNER, P.C.
620 High Park Way ▪ P.O. Box 4947
Missoula, MT 59806-4947
hstone@bigskylawyers.com;
acampbell@bigskylawyers.com
*Attorneys for Proposed Intervenors-*
    *Defendants Sportsmen's Alliance*
    *Foundation, Safari Club*
    *International, and Rocky Mountain*
    *Elk Foundation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, et al, | **Lead Case 9:24-cv-00043-DWM** |
| Plaintiffs, | |
| and | Member Case 9:24-cv-00044-DWM |
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Consolidated Plaintiffs, | |
| v. | **DECLARATION STEVEN P. BROCK IN SUPPORT OF ROCKY MOUNTAIN ELK FOUNDATION'S MOTION TO INTERVENE** |
| UNITED STATES FISH AND WILDLIFE SERVICE, et al., | |
| Defendants, | |
| and | |
| SPORTSMEN'S ALLIANCE FOUNDATION, SAFARI CLUB INTERNATIONAL, and ROCKY MOUNTAIN ELK FOUNDATION, | |
| Proposed Intervenors-Defendants. | |



EXHIBIT
B
tabbies®

**DECLARATION OF STEVEN P. BROCK IN SUPPORT OF
ROCKY MOUNTAIN ELK FOUNDATION'S MOTION TO INTERVENE     PAGE 1**
12231.004

I, Steven P. Brock, declare as follows:

1.      I am a resident of Cody, Wyoming, located in Park County.  I am 73 years old.

2.      I am retired.  I worked for the U.S. Fish and Wildlife Service before finishing my career at the National Elk Refuge in Wyoming, working within the Greater Yellowstone Ecosystem.

3.      I started hunting when I was 16 in Arizona.  Since then, I have hunted deer, elk, pronghorn, moose, wolves and bighorn sheep.  My favorite has always been elk.  I shot my first elk when I was in college in 1970 and I have hunted elk every year since.  I began hunting elk in Wyoming in 1997 and plan on hunting elk again in 2024.

4.      I am currently a life member of the Cody Chapter of the Rocky Mountain Elk Foundation ("RMEF") and have been a member since 1987.

5.      I have been actively involved with RMEF for the entire time I have been a member.  I served as chapter chair or co-chair for eight years, served on various committees almost every year and have judged the annual RMEF elk bugling contest for the last 12 to 15 years.  I have also been involved with fundraising and banquets.

6.      From 2011 to 2012, I worked with Wyoming Game and Fish Department on the Cody Elk Working Group to help set new hunting seasons and

limits for elk in the area after elk populations declined due to predator activity. In the years prior to that, wolves and grizzlies were both listed under the ESA and could not be hunted or managed. Grizzlies still are listed, but Wyoming now allows wolf hunting, which has helped manage populations and decrease some predation on elk.

7.      I really love elk. I enjoy hunting elk, watching elk, and listening to them bugle in the fall. Much of my life has been focused on elk conservation and putting myself in places where I can hunt and enjoy elk. I moved to Cody in 2007 because it was outstanding bull elk hunting. Now there are fewer bulls in this area, and I must travel many hours for good opportunities to hunt elk.

8.      I have observed gray wolves almost every time I have hunted in Wyoming over the past 20 years. Overall, I've seen increased populations of gray wolves, and have seen the impact that they, as well as other predators, can have on elk populations. Allowing the state to have the tools to manage wolves can help keep healthy elk populations on the landscape.

9.      I have seen the effects of predation from grizzly bears, gray wolves, and mountain lions on elk and other big game in the areas around Yellowstone National Park. I have seen drastically reduced calf elk production in the migratory segments of the Cody Elk Herd, resulting in some segments of the herd producing as few as 7 to 15 calves per 100 cows, which is significantly fewer than an average

production level of 35 to 45 elk calves per 100 cows across the Northern Rocky Mountains.

10.    I strongly believe that state management of gray wolves is very important to maintain populations of elk and other big game. I have seen some of the best public elk hunting opportunities diminish in the areas within the areas that I used to hunt where wolf populations have really spiked.

11.    If gray wolves are placed back on the Endangered Species List, Wyoming will be unable to manage gray wolf populations. Elk populations may continue to crash and my opportunities to hunt elk and other big game species will become more and more limited if gray wolves are relisted and placed under Federal management.

12.    I provide this declaration in support of the Rocky Mountain Elk Foundation's motion to intervene in this litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, as provided by 28 U.S.C. § 1746.

Executed this 2nd day of May, 2024, in Cody, Wyoming.

By _Steven P. Brock_
Steven P. Brock

**DECLARATION OF STEVEN P. BROCK IN SUPPORT OF**
**ROCKY MOUNTAIN ELK FOUNDATION'S MOTION TO INTERVENE**          **PAGE 4**
12231.004

Hannah Stone, Esq.
Alyssa L. Campbell, Esq.
MILODRAGOVICH, DALE &
    STEINBRENNER, P.C.
620 High Park Way ▪ P.O. Box 4947
Missoula, MT 59806-4947
hstone@bigskylawyers.com;
acampbell@bigskylawyers.com
*Attorneys for Proposed Intervenors-
    Defendants Sportsmen's Alliance
    Foundation, Safari Club
    International, and Rocky Mountain
    Elk Foundation*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION**

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, et al,<br><br>　　　Plaintiffs,<br><br>and<br><br>CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>　　　Consolidated Plaintiffs,<br><br>　　v.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE, et al.,<br><br>　　　Defendants,<br><br>and<br><br>SPORTSMEN'S ALLIANCE FOUNDATION, SAFARI CLUB INTERNATIONAL, and ROCKY MOUNTAIN ELK FOUNDATION,<br><br>　　　Proposed Intervenors-Defendants. | **Lead Case 9:24-cv-00043-DWM**<br><br>Member Case 9:24-cv-00044-DWM<br><br><br>**DECLARATION OF TRAVIS BARTON BULLOCK IN SUPPORT OF SAFARI CLUB INTERNATIONAL'S MOTION TO INTERVENE** |



**DECLARATION OF TRAVIS BARTON BULLOCK IN SUPPORT
OF SAFARI CLUB INTERNATIONAL'S MOTION TO INTERVENE**　　　**PAGE 1**

12231.004

## DECLARATION OF TRAVIS BARTON BULLOCK

I, Travis Barton Bullock, depose and state as follows:

1.    I am a resident of Challis, Idaho.  I am a hunter and hunting outfitter.

2.    I have been hunting since I was a boy.  Hunting is a family tradition that I learned from my father and grandfather.  I have passed the tradition down to my own children.

3.    My great grandfather moved to Idaho in the 1860s.  Our roots run deep.  I am knowledgeable about the environment and wildlife conditions in Central Idaho due to my family's longstanding ties and my own involvement in the outdoor industry.

4.    I am a Life Member of Safari Club International ("Safari Club") and have been a member for more than 20 years.  I have been a member of different Safari Club chapters over the years and donated hunts for their fundraisers.

5.    I am also a member of the Idaho Outfitters and Guides Association and the Foundation for Wildlife Management.  The Foundation is a non-profit organization whose missions are to promote ungulate population recovery in areas negatively impacted by wolves, assist state game management agencies in meeting their wolf management objectives, promote youth in the outdoors, and educate the public on the negative impact the successful reintroduction of wolves has had on Western ungulate populations.

6.    I hunt and fish most of the year, for myself and for my business.  I purchased Mile High Outfitters in 1995, and I currently own this business and others with my wife and sons.  We offer elk, mule deer, black bear, and mountain lion hunting, as well as fishing trips, in the Frank Church Wilderness and the Salmon River Mountains.  About 85% of our guided hunting is for elk and mule deer.  About 10% is for wolf, mountain lion, and bear.  About 5% of our business is guided fishing.

7.    Our business and much of my personal hunting and fishing takes place in the Frank Church Wilderness and Salmon River Mountains.  This is a remote area and difficult to access.  In the wilderness areas, no motorized transport or other equipment may be used except airplanes on designated airstrips.  These

**DECLARATION OF TRAVIS BARTON BULLOCK IN SUPPORT**
**OF SAFARI CLUB INTERNATIONAL'S MOTION TO INTERVENE**          **PAGE 2**

airstrips have no winter maintenance. We pack in on horses, use a horse-driven plough to clear snow, and must set up and then remove our camp each year. Wolves were reintroduced into this habitat in 1995, in part because it is so remote and difficult to access, and offers good habitat for elk, deer, moose (before wolf reintroduction), and of course, the wolves themselves.

8.      However, because the area is so remote, it is difficult to manage the wolf population. Even with hunting and trapping, we hardly put a dent in their numbers. And for this reason, wolves in Salmon River Mountains and Frank Church Wilderness have had an incredible and possibly irreversible impact in reducing moose, elk, and deer populations.

9.      The impact of wolves on Central Idaho's moose populations is indefensible. Moose have been almost eradicated from Central Idaho due to predation from gray wolves. The moose population fell within five years of the introduction of gray wolves in 1995. When I was growing up in this area, we would see moose sporadically in the Salmon River Mountains and Frank Church Wilderness (before it was even designated a wilderness). When I first purchased my outfitting business in 1995, I saw an increase in the moose population in this area. But then I observed a significant drop in the moose population following the introduction of wolves. And now, it is rare for me to even see signs of a moose. I doubt the moose population in Central Idaho can or will ever recover due to the predation of wolves on moose calves and the consequent impacts on cow moose survival and reproduction.

10.      The loss of moose is clearly shown in tag numbers. Idaho Fish and Game used to allocate 1,200 moose tags. Now they are down to 550 across the state, and almost none in Central Idaho.

11.      The elk population in Central Idaho has also been hammered by gray wolf predation, although I have seen some recovery in the elk herds. Wolves did not start to impact the elk until the moose population was depleted. Then wolves turned to elk and began to prey heavily on elk calves. For the first few years, the elk population still looked healthy. This is because there were still cow and bull elk. But the calf numbers plummeted. In about 2008 or 2009, Central Idaho's elk population crashed. There were simply not enough young cows to replace the cows that were aging and dying, due to the wolves' predation on elk calves.

**DECLARATION OF TRAVIS BARTON BULLOCK IN SUPPORT OF SAFARI CLUB INTERNATIONAL'S MOTION TO INTERVENE**                    **PAGE 3**
12231.004

12.     Based on my experience living, hunting, and guiding around the Middle Fork of the Salmon River, I believe that the elk population in this area has declined by 80%. I have stood in one spot and counted elk, both in 1995 and today. And the real numbers of elk are a fraction of where they were before gray wolves were introduced.

13.     And, of course, as the elk population has declined, gray wolves have preyed heavily on mule deer. We have seen this cycle of predation with all our ungulate species in Central Idaho.

14.     As a hunter, I am proud to say that the elk population in our areas rebounded some after wolf hunting was reopened in 2009, following the removal of gray wolves in Idaho from the Endangered Species Act ("ESA") list. A lot of hunters engaged in the 2009 season. We were able to properly manage the wolf population for the first time since introduction. And the elk and mule deer responded.

15.     I am frustrated by lawsuits like this, which assert that incredibly robust wolf populations are at risk of extinction. That is completely untrue. The gray wolf population is not only secure, but it is contributing to the local eradication of ungulate populations.

16.     Additionally, wolf hunting and trapping can hardly put a dent in the wolf population in Central Idaho. Again, this area is remote and hard to access. It is expensive and time consuming to set and check traps. Wolf hunting, and all predator hunting really, has low success rates. This is due to the terrain and the fact that predators are smart and are good at avoiding people. It is very difficult to control the wolf population in this area because it is so labor intensive. Taking away the limited successful hunting and trapping that we do have will destroy the ungulate populations.

17.     I am also frustrated by lawsuits like this because they seem to benefit the plaintiff organizations, but not the wildlife. I respect all wildlife, including wolves—and also moose, elk, and deer. Organizations like the plaintiffs in these lawsuits show no respect for the ungulate populations that should range throughout Central Idaho, but which have been depressed and compressed due to wolf predation.

**DECLARATION OF TRAVIS BARTON BULLOCK IN SUPPORT OF SAFARI CLUB INTERNATIONAL'S MOTION TO INTERVENE**          **PAGE 4**
12231.004

18.     I will be greatly injured if the plaintiffs succeed in these lawsuits. My business will suffer. Again, 85% of my hunting clients are interested in elk and mule deer. If we cannot hunt or trap wolves in Central Idaho, elk and mule deer populations will crater. And there will be no ungulates left to hunt.

19.     In addition, my business includes guided wolf hunting trips. My losses will be greater because these hunting opportunities will also end.

20.     My personal enjoyment of wildlife and hunting will also be diminished. It is a family tradition to hunt in the Middle Fork area. Again, without healthy populations of elk and deer, hunting of these species will disappear.

21.     I make this declaration based on my personal knowledge and in support of Safari Club's efforts to intervene in these cases.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 27 day of April, 2024.

_____
Travis Barton Bullock

**DECLARATION OF TRAVIS BARTON BULLOCK IN SUPPORT OF SAFARI CLUB INTERNATIONAL'S MOTION TO INTERVENE**          **PAGE 5**
12231.004

Hannah Stone, Esq.
Alyssa L. Campbell, Esq.
MILODRAGOVICH, DALE &
   STEINBRENNER, P.C.
620 High Park Way ▪ P.O. Box 4947
Missoula, MT 59806-4947
hstone@bigskylawyers.com;
acampbell@bigskylawyers.com
*Attorneys for Proposed Intervenors-*
*Defendants Sportsmen's Alliance*
*Foundation, Safari Club International,*
*and Rocky Mountain Elk Foundation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, et al, | **Lead Case 9:24-cv-00043-DWM** |
|        Plaintiffs, | Member Case 9:24-cv-00044-DWM |
| and | |
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
|        Consolidated Plaintiffs, | |
|     v. | **DECLARATION OF WILLIAM J. FINCH IN SUPPORT OF MOTION TO INTERVENE** |
| UNITED STATES FISH AND WILDLIFE SERVICE, et al., | |
|        Defendants, | |
| and | |
| SPORTSMEN'S ALLIANCE FOUNDATION, SAFARI CLUB INTERNATIONAL, and ROCKY MOUNTAIN ELK FOUNDATION, | |
|        Proposed Intervenors-Defendants. | |



**DECLARATION OF WILLIAM J. FINCH IN
SUPPORT OF MOTION TO INTERVENE**
                                 **PAGE 1**
12231.004

## DECLARATION OF WILLIAM J. FINCH

I, William J. Finch, depose and state as follows:

1. I am a resident of Wilsall, Montana. I was born and raised in Montana and returned to live here in my retirement.

2. I have been hunting since I was 12 years old. Hunting is a family tradition. My dad first brought me hunting me when I was old enough to walk.

3. I am a member of Safari Club International ("Safari Club") and President of Safari Club's Southwest Montana Chapter.

4. I am also a Life Member of Rocky Mountain Elk Foundation.

5. I am retired and use my time to hunt whenever I can. In Montana, I hunt antelope, deer, elk, and mountain goat. I have hunted in other countries including Greenland, South Africa, Canada, and Scotland. I have seen hunting used as a wildlife management tool in the U.S. and around the world.

6. I purchase a wolf tag in Montana every year. I have not yet successfully harvested a wolf, but I always have the tag in my pocket when I am hunting, and I am always on the lookout for the opportunity to harvest a wolf. But wolf hunting is not easy. Wolves are smart. Even when Montana increased the bag limits for wolves, it has not led to a big increase in wolves successfully hunted statewide.

7. Montana has a fully recovered wolf population, which is more than abundant. It needs to be properly managed to reduce the negative impacts that wolves are having on elk, deer, and other prey populations.

8. I have seen and heard of elk in the high plains in Montana. Elk used to inhabit the plains, but they moved to the mountains in the 1800s to reduce their exposure to humans. Now, elk have come down from the mountains to the plains to get away from gray wolves.

9. I just read an article about wolves killing and consuming an elk on the football field at Gardiner Public School. The wolf population is more than healthy in Montana, and unfortunately, it is more brazen than it should be.

**DECLARATION OF WILLIAM J. FINCH IN**
**SUPPORT OF MOTION TO INTERVENE**                    **PAGE 2**
12231.004

*See* https://www.bozemandailychronicle.com/news/environment/gardiner-public-school-yellowstone-national-park-wolf/article_107ac996-a5d5-5ba2-9a70-df99208e3f4d.html.

10.    If the plaintiffs succeed in these lawsuits, I will be injured because my ability to hunt and enjoy elk, deer, and other wildlife will be diminished.  The wolf population will continue to increase and expand, with further negative impacts on elk and deer.

11.    If the plaintiffs succeed in these lawsuits, I will also be injured because relisting wolves under the Endangered Species Act will remove my ability to successfully hunt a wolf.  This is one of my hunting goals.

12.    I make this declaration based on my personal knowledge and in support of Safari Club and Rocky Mountain Elk Foundation's efforts to intervene in these cases.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 24th day of April, 2024.


William J. Finch

Hannah Stone, Esq.
Alyssa L. Campbell, Esq.
MILODRAGOVICH, DALE &
    STEINBRENNER, P.C.
620 High Park Way ▪ P.O. Box 4947
Missoula, MT 59806-4947
hstone@bigskylawyers.com;
acampbell@bigskylawyers.com
*Attorneys for Proposed Intervenors-*
    *Defendants Sportsmen's Alliance*
    *Foundation, Safari Club*
    *International, and Rocky Mountain*
    *Elk Foundation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, et al, | **Lead Case 9:24-cv-00043-DWM** |
| Plaintiffs, | Member Case 9:24-cv-00044-DWM |
| and | |
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Consolidated Plaintiffs, | |
| v. | **DECLARATION OF REW R. GOODENOW IN SUPPORT OF SAFARI CLUB INTERNATIONAL'S MOTION TO INTERVENE** |
| UNITED STATES FISH AND WILDLIFE SERVICE, et al., | |
| Defendants, | |
| and | |
| SPORTSMEN'S ALLIANCE FOUNDATION, SAFARI CLUB INTERNATIONAL, and ROCKY MOUNTAIN ELK FOUNDATION, | |
| Proposed Intervenors-Defendants. | |



EXHIBIT

E

**DECLARATION OF REW R. GOODENOW IN SUPPORT OF
SAFARI CLUB INTERNATIONAL'S MOTION TO INTERVENE**          **PAGE 1**
12331.004

I, Rew R. Goodenow, depose and state as follows:

1.      I am Chair of the Legal Task Force of proposed Intervenor-Defendant Safari Club International ("Safari Club").

2.      I have personal knowledge of the matters set forth in this Declaration, except those stated on information and belief, which I believe to be true.

3.      Safari Club is an I.R.C. § 501(c)(4) nonprofit organization representing approximately 88,000 members and advocates worldwide.  In addition to the national organization, Safari Club maintains a large network of 147 Chapters where individual members meet regularly and, among other activities, invest in local sustainable use and other conservation programs.

4.      Safari Club has tens of thousands of members who live or hunt in the states of California, Colorado, Idaho, Montana, Nevada, Oregon, Utah, Washington, and Wyoming.  These are states identified by the plaintiffs in these lawsuits as a home to the Western Distinct Population Segment ("DPS") of gray wolves.  Safari Club also has 32 local Chapters in these states.

5.      I am a resident of this Western DPS.  I personally hunt elk, mule deer, and pronghorn in Nevada.

6.      Both from personal knowledge and based on information and belief informed in part by the Declarations submitted herewith, Safari Club has thousands of members who live in the Northern Rocky Mountains DPS of gray wolves, and who benefit from the regulated hunting and trapping of this species.

7.      Safari Club's mission "is to protect the freedom to hunt and promote wildlife conservation worldwide."  Its purposes include:

- to advocate, preserve and protect the rights of all hunters;

- to promote safe, legal and ethical hunting and related activities;

- to monitor, support, educate or otherwise take positions on local, national and international legislative, executive, judicial or organizational endeavors that foster and support these purposes and objectives, within the limits imposed by law and regulation; and

- to inform and educate the public concerning hunting and related activities.

8.      In fulfilling its mission and purposes, Safari Club advocates on behalf of sustainable use conservation. "Sustainable use" recognizes that the use of wildlife can incentivize conservation by providing benefits to local stakeholders, as well as responsibly managing a species within its social and ecological carrying capacities. This is particularly true in the case of gray wolves.

9.      Safari Club has significant experience in litigation concerning wildlife conservation and management issues. Based on information and belief, Safari Club is one of only a handful of pro-sustainable use organizations with in-house counsel knowledgeable in this subject. Safari Club has participated as defendant, plaintiff, or amicus in cases involving the Endangered Species Act ("ESA") and other federal laws in over 50 cases in the last decade.

10.     Safari Club has participated in multiple cases involving the federal listing status and management of gray wolves. Safari Club has previously intervened to defend the delisting of Northern Rocky Mountains DPS wolves, as well as Wyoming wolves. Safari Club has also intervened to defend the delisting of wolves in the Great Lakes States. *E.g.*, *Humane Soc'y of the U.S. v. Kempthorne*, 579 F. Supp. 2d 7 (D.D.C. 2008); *Defs. of Wildlife v. Hall*, 565 F. Supp. 2d 1160 (D. Mont. 2008); *All. for the Wild Rockies v. Salazar*, 672 F.3d 1170 (9th Cir. 2012); *Humane Soc'y of the U.S. v. Jewell*, 76 F. Supp. 3d 69 (D.D.C. 2014); *Defs. of Wildlife v. Zinke*, 68 F. Supp. 3d 193 (D.D.C. 2014).

11.     The plaintiffs have challenged the U.S. Fish and Wildlife Service's decision not to relist wolves in the Northern Rocky Mountains DPS under the ESA. Both from personal knowledge and based on information and belief informed in part by the Declarations submitted herewith, if the plaintiffs succeed in obtaining their requested relief, the plaintiffs' success would deprive Safari Club members of their ability to hunt gray wolves in the Northern Rocky Mountains DPS. It would also deprive Safari Club members of their ability to assist in the responsible management and conservation of this predator species through hunting.

12.     The plaintiffs' success in returning gray wolves in this DPS to endangered status under the ESA would also harm Safari Club members by depriving them of opportunities to hunt and enjoy game species whose population numbers and behavior have been impacted by the presence of wolves.

**DECLARATION OF REW R. GOODENOW IN SUPPORT OF**
**SAFARI CLUB INTERNATIONAL'S MOTION TO INTERVENE**          **PAGE 3**
12331.004

13.     Further, the plaintiffs' success would harm Safari Club's organizational interests in promoting sustainable use conservation and regulated hunting as a valuable means to conserve and manage gray wolf populations, in balance with the other game species that Safari Club members and the general hunting community enjoy and seek to conserve.

14.     I make this declaration based on my personal knowledge and on information and belief where noted, in support of Safari Club, Sportsmen's Alliance Foundation, and Rocky Mountain Elk Foundation's efforts to intervene in these cases.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 25th day of April, 2024.

Rew R. Goodenow

Hannah Stone, Esq.
Alyssa L. Campbell, Esq.
MILODRAGOVICH, DALE &
    STEINBRENNER, P.C.
620 High Park Way • P.O. Box 4947
Missoula, MT 59806-4947
hstone@bigskylawyers.com;
acampbell@bigskylawyers.com
*Attorneys for Proposed Intervenors-
    Defendants Sportsmen's Alliance
    Foundation, Safari Club
    International, and Rocky Mountain
    Elk Foundation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, et al, | **Lead Case 9:24-cv-00043-DWM** |
| Plaintiffs, | Member Case 9:24-cv-00044-DWM |
| and | |
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Consolidated Plaintiffs, | |
| v. | **DECLARATION OF COREY JACOSEN IN SUPPORT OF ROCKY MOUNTAIN ELK FOUNDATION'S MOTION TO INTERVENE** |
| UNITED STATES FISH AND WILDLIFE SERVICE, et al., | |
| Defendants, | |
| and | |
| SPORTSMEN'S ALLIANCE FOUNDATION, SAFARI CLUB INTERNATIONAL, and ROCKY MOUNTAIN ELK FOUNDATION, | |
| Proposed Intervenors-Defendants. | |



EXHIBIT
tabbies
F

**DECLARATION OF COREY JACOBSEN IN SUPPORT OF**
**ROCKY MOUNTAIN ELK FOUNDATION'S MOTION TO INTERVENE**          **PAGE 1**
12231.004

I, Corey Jacobsen, declare as follows:

1.      I live in Donnelly, Idaho, located in Valley County.  I am 48 years old.

2.      I work in the hunting industry as a writer, film producer, and educator related to elk and elk hunting.  I am an 11-time World Champion Elk Caller and have created several elk hunting websites, magazines, and media platforms.

3.      I started hunting in my home state of Idaho in 1987 when I was 12 years old.

4.      I first joined the Rocky Mountain Elk Foundation ("RMEF") in 1994.  I am a life member of RMEF, have been an active participant in the several RMEF chapters in Idaho, and collaborate with RMEF in some of my media work.

6.      Over the past 36 years of elk hunting, I have successfully hunted elk in nine (9) different states.  I enjoy hunting elk, seeing elk, hearing elk and searching for elk antler sheds in the spring.  In 2024, I intend to hunt elk in at least two to three states.

8.      I have personally observed increasing numbers of gray wolves in the areas I have hunted in multiple states, but especially in Idaho, Montana, and Wyoming prior to wolves being delisted.  Since delisting, in some areas I have seen wolf populations respond to management and have seen elk and other big game bounce back.  In others, where there is limited access or limited opportunities to hunt

**DECLARATION OF COREY JACOBSEN IN SUPPORT OF**
**ROCKY MOUNTAIN ELK FOUNDATION'S MOTION TO INTERVENE        PAGE 2**
12231.004

and manage wolves, the wolf populations seem to be strong, and having a large impact on the big game there.

9.     I have seen the effects of predation from grizzly bears, gray wolves and mountain lions on elk and other big game animals in the Northern Rocky Mountains, particularly in Idaho.  I have seen drastically reduced calf elk production in the migratory segments of several specific Elk Herds (including the Lochsa/Selway, Bitterroot, Salmon River, Lemhi, etc.).  The wolf population in northern Idaho presents significant challenges for management, as much of the area is inaccessible due to being designated wilderness.  Relisting wolves would make management options even more limited, putting additional pressure on this already struggling elk herd.

11.     I believe that state management of gray wolves is necessary to maintain healthy ungulate populations. Gray wolves have to be actively and aggressively managed in order to maintain a healthy predator/prey relationship, and in order to maintain perpetually healthy populations of elk, moose, deer and other big game. There are large portions in Idaho, Montana, and Wyoming that are inaccessible or where wolf hunting is not permitted, like the National Parks, limiting wolf population management to some extent.  Relisting wolves would further limit the states' ability to manage wolf and game populations in a balanced manner.

**DECLARATION OF COREY JACOBSEN IN SUPPORT OF**
**ROCKY MOUNTAIN ELK FOUNDATION'S MOTION TO INTERVENE**          **PAGE 3**
12231.004

12.     If gray wolves are placed back on the Endangered Species List, it will remove the state's abilities to manage wolf populations, thus sending big game populations plummeting once again. This will be detrimental to the future of big game and big game hunting in all states affected.

13.     I provide this declaration in support of the Rocky Mountain Elk Foundation's motion to intervene in this litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, as provided by 28 U.S.C. § 1746.

Executed this 3rd day of May, 2024 in Donnelly, Idaho.

By _____
     Corey Jacobsen

**DECLARATION OF COREY JACOBSEN IN SUPPORT OF**
**ROCKY MOUNTAIN ELK FOUNDATION'S MOTION TO INTERVENE**          **PAGE 4**
12231.004

Hannah Stone, Esq.
Alyssa L. Campbell, Esq.
MILODRAGOVICH, DALE &
    STEINBRENNER, P.C.
620 High Park Way • P.O. Box 4947
Missoula, MT 59806-4947
hstone@bigskylawyers.com;
acampbell@bigskylawyers.com
*Attorneys for Proposed Intervenors-*
    *Defendants Sportsmen's Alliance*
    *Foundation, Safari Club*
    *International, and Rocky Mountain*
    *Elk Foundation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, et al, | **Lead Case** <br> **9:24-cv-00043-DWM** |
| Plaintiffs, | |
| and | Member Case <br> 9:24-cv-00044-DWM |
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Consolidated Plaintiffs, | |
| v. | **DECLARATION OF MATT LUMLEY IN SUPPORT OF SAFARI CLUB INTERNATIONAL'S MOTION TO INTERVENE** |
| UNITED STATES FISH AND WILDLIFE SERVICE, et al., | |
| Defendants, | |
| and | |
| SPORTSMEN'S ALLIANCE FOUNDATION, SAFARI CLUB INTERNATIONAL, and ROCKY MOUNTAIN ELK FOUNDATION, | |
| Proposed Intervenors-Defendants. | |



EXHIBIT
G

**DECLARATION OF MATT LUMLEY IN SUPPORT OF**
**SAFARI CLUB INTERNATIONAL'S MOTION TO INTERVENE**          **PAGE 1**
12231.004

I, Matt Lumley, depose and state as follows:

1.      I am a resident of Emigrant, Montana.  I have been a hunter my entire life, and hunt and trap as a career, to enjoy time outdoors, and to obtain food and animal products.  I hunt and trap many species, including wolves.  I basically hunt and trap every day in season.

2.      I am a member of Safari Club International ("Safari Club") and serve on several of Safari Club's national committees.  I am also a member of Safari Club's Southwest Montana Chapter.

3.      I am also the President of Montana Trappers Association.  This is a nonprofit and the principal state-level organization for trappers in Montana.

4.      I have hunted wolves for at least 20 years.  I was previously employed by the U.S. Department of Agriculture Wildlife Services.  In this position, I hunted and trapped wolves and other predators, along with many other species.

5.      I continue to responsibly manage wolves and other predators as part of my current position as manager of a wildlife-oriented ranch.  Achieving a balance between predators and other species is an important part of my duties, and of wildlife management in general.

6.      In my professional and personal experience, I have seen the gray wolf population in the western United States grow exponentially.  Wolf populations in Montana alone are ten times above the U.S. Fish and Wildlife Service's recovery goals.  Montana's wolf population is more than robust and is currently estimated between 1,200 and 1,500 wolves.

7.      Western wolf populations are in no danger of extinction.  If gray wolves are re-listed under the U.S. Endangered Species Act, it will be devastating for wildlife populations and hunters in the West.  It will demonstrate the weaponization of the Endangered Species Act by special interests that do not care about the health of wildlife populations overall.

8.      While wolf populations have expanded in size and range, populations of their favorite prey have crashed.  As one example, Shiras moose have been depleted in Montana and other Western states, due primarily if not exclusively to predation by reintroduced gray wolves. Prior to reintroduction in 1995, Wyoming gave out 1,500

**DECLARATION OF MATT LUMLEY IN SUPPORT OF**
**SAFARI CLUB INTERNATIONAL'S MOTION TO INTERVENE**          **PAGE 2**
12231.004

bull moose tags.  Currently, Wyoming gives out 150 tags, because the moose population has declined so steeply.

9.     As another example, in 2001, before gray wolves turned their attention to elk, there were close to 20,000 head of elk in southern Montana, in the Yellowstone ecosystem.  Today there are under 5,000.

10.     Responsible predator management is a critical component to protecting healthy populations of prey species like moose, elk, and deer.  While wolves are delisted from the Endangered Species Act, Montana and other states can authorize hunting and trapping seasons to support this goal of predator management.

11.     Research shows that wolf populations continue to grow unless harvest rates reach 30-40% of the population, and even then, the wolf population will remain stable.  Even with current bag and trapping limits, wolf offtakes in Montana are nowhere near this level, and the wolf population remains high and continues to expand.  If wolves are relisted under the Endangered Species Act, it will be devastating because the wolf population will be out of control.  Prey populations like Shiras moose will be near extinction in the West.

12.     The North American Model of Wildlife Conservation should be celebrated as one of the greatest wildlife success stories.  Wolves are part of that story.  But wildlife management must be holistic and conserve all species.  I do not support single-species management, such as focusing on gray wolves, to the detriment of the moose, elk, and deer.  If the plaintiffs succeed and force a single-species focus on wolves, I will no longer be able to engage in a hunting and trapping activity that I enjoy.  But worse, I will no longer be able to engage in hunting of other species, like elk, because of the wolves' detrimental impact.

13.     I make this declaration based on my personal knowledge and in support of Safari Club's efforts to intervene in these cases.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 24th day of April, 2024.

Matt Lumley

**DECLARATION OF MATT LUMLEY IN SUPPORT OF SAFARI CLUB INTERNATIONAL'S MOTION TO INTERVENE**                   **PAGE 3**

Hannah Stone, Esq.
Alyssa L. Campbell, Esq.
MILODRAGOVICH, DALE &
    STEINBRENNER, P.C.
620 High Park Way • P.O. Box 4947
Missoula, MT 59806-4947
hstone@bigskylawyers.com;
acampbell@bigskylawyers.com
*Attorneys for Proposed Intervenors-*
    *Defendants Sportsmen's Alliance*
    *Foundation, Safari Club*
    *International, and Rocky Mountain*
    *Elk Foundation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, et al, | **Lead Case 9:24-cv-00043-DWM** |
| Plaintiffs, | Member Case 9:24-cv-00044-DWM |
| and | |
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Consolidated Plaintiffs, | |
| v. | **DECLARATION OF PAUL ROSSIGNOL IN SUPPORT OF SPORTSMEN'S ALLIANCE FOUNDATION'S MOTION TO INTERVENE** |
| UNITED STATES FISH AND WILDLIFE SERVICE, et al., | |
| Defendants, | |
| and | |
| SPORTSMEN'S ALLIANCE FOUNDATION, SAFARI CLUB INTERNATIONAL, and ROCKY MOUNTAIN ELK FOUNDATION, | |
| Proposed Intervenors-Defendants. | |



EXHIBIT
H

**DECLARATION OF PAUL ROSSIGNOL IN SUPPORT OF
SPORTSMEN'S ALLIANCE FOUNDATION'S MOTION TO INTERVENE    PAGE 1**
12231.004

I, Paul Rossignol, depose and state as follows:

1.     I reside in Missoula County Montana and am over 18 years of age. I make this Declaration in support of Sportsmen's Alliance Foundation's Motion to intervene in these two consolidated cases.

2.     I have personal knowledge of the matters set forth in this Declaration.

3.     I am a current voluntary member of the U.S. Sportsmen's Alliance. I support the mission of the U.S. Sportsmen's Alliance and Sportsmen's Alliance Foundation.

4.     I am also an officer and founding member of Montana Sportsmen for Fish and Wildlife. Montana Sportsmen for Fish and Wildlife is also a voluntary member of U.S. Sportsmen's Alliance.

5.     I personally own a ranch and grazing land in Missoula County, Montana, near the Lolo Creek drainage. Prior to wolves entering the area, there was extensive summer pasture in this drainage. Cattle were prevalent in the area for miles. Moose, elk, and deer were prevalent as well. The woods were full of hunters and guides during the hunting season.

6.     Around approximately the mid-nineties, I began to hear of plans to reintroduce the gray wolf in Montana. I began attending meetings to discuss the reintroduction of the wolves and discussed my fears and concerns.

7.     In the early 2000s, I began to hear wolves howling and started seeing large canine tracks in the area. It was shocking to realize that the wolves had already arrived on my property.

8.     It did not take long to see the effects. One of the ranches nearby relinquished their United States Forest Service grazing leases due to calves not showing up in the fall. By this time, my family had sold our cattle and we were leasing our grazing to local cattlemen. I was honest with these cattlemen and warned them that wolves were prevalent on and near my ranch. Because of this, the cattlemen pulled their leases.

9.     The effects on elk, deer, and moose were evident and quite rapid as well. There was a particular spring during this time where I was inspecting my

property with a friend. As we walked, we observed many patches of whitetail deer hair in various locations around the property. It did not take long to determine that these were wolf kills. These patches were widespread around my entire ranch.

10.     Perhaps my biggest heartache was the end of a twenty-plus year tradition of hunting on my property with some of my closest friends. To this day, it fills me with sorrow when I think about telling my friends that we could no longer hunt deer and elk on my property because the wildlife in the area had been decimated by wolves.

11.     As a result of my experience, I helped found the Montana Sportsmen for Fish and Wildlife to help others that were damaged by wolves. The organization was immediately welcomed by ranchers, hunters, trappers, and other outdoor enthusiasts.

12.     In September of 2012, I obtained my wolf trapping certificate. I began trapping wolves on and around my property. There were wolf dens on and near my property at this time. I was aware of others trapping and hunting wolves in the area as well. Over the course of the decade following the delisting of the gray wolf, I began to note the changes as pack sizes declined and sightings decreased in the area.

13.     In approximately 2018, a cattleman contacted me about grazing my ranch again. While I explained that wolves were still prevalent on the landscape, he agreed to give it a try. That year two of his cows had calves in the summer pasture. Neither one of the calves showed up in the fall. Upon examination, I found red angus hair in some of the wolf scat on the landscape.

14.     I have continued trapping wolves and having success. During the most recent two years, a different cattleman has rented my ranch for grazing. Despite informing him that wolves were still present on the landscape, we have worked to make the process successful. So far we have had no losses, and the cows and calves look good after a summer on the range. I have begun seeing fewer signs of wolves and I seldom have pictures of wolves on my game cameras. The wildlife is also returning to the area. Two seasons ago, I harvested an elk for the first time in 10 years on my property. I believe my trapping of wolves was a significant factor in reducing the wolf presence in the area and ultimately allowing me to use my land productively again.

**DECLARATION OF PAUL ROSSIGNOL IN SUPPORT OF**
**SPORTSMEN'S ALLIANCE FOUNDATION'S MOTION TO INTERVENE          PAGE 3**

15.     Wolf populations have directly and negatively impacted our ability to lease our land to others for grazing and hunting and to make agriculturally productive use of our land. Cattlemen experience losses because of high wolf numbers. It has also hindered our ability to recreate and enjoy our properties and other areas of the state.

16.     It is my understanding that if the plaintiffs in these lawsuits are successful, then it is possible that the wolves in Montana could be relisted under the Endangered Species Act and that will eliminate Montana's and my own ability to manage them.

17.     I will be personally affected if the wolves are relisted because my ability to rent, lease, contract, and make productive use of my land will be compromised. This includes my own abilities to hunt, trap, and otherwise recreate on my property and in other areas of Montana. This will result in significant financial, business, and personal harm.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _7_ day of ~~April~~ *MAY* 2024 in _Missoula_ , Montana.

Paul Rossignol

Hannah Stone, Esq.
Alyssa L. Campbell, Esq.
MILODRAGOVICH, DALE &
    STEINBRENNER, P.C.
620 High Park Way ▪ P.O. Box 4947
Missoula, MT 59806-4947
hstone@bigskylawyers.com;
acampbell@bigskylawyers.com
*Attorneys for Proposed Intervenors-
    Defendants Sportsmen's Alliance
    Foundation, Safari Club
    International, and Rocky Mountain
    Elk Foundation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, et al, | **Lead Case 9:24-cv-00043-DWM** |
| Plaintiffs, | |
| and | Member Case 9:24-cv-00044-DWM |
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Consolidated Plaintiffs, | |
| v. | **DECLARATION OF R. KYLE WEAVER IN SUPPORT OF ROCKY MOUNTAIN ELK FOUNDATION'S MOTION TO INTERVENE** |
| UNITED STATES FISH AND WILDLIFE SERVICE, et al., | |
| Defendants, | |
| and | |
| SPORTSMEN'S ALLIANCE FOUNDATION, SAFARI CLUB INTERNATIONAL, and ROCKY MOUNTAIN ELK FOUNDATION, | |
| Proposed Intervenors-Defendants. | |



EXHIBIT
I

**DECLARATION OF R. KYLE WEAVER IN SUPPORT OF
ROCKY MOUNTAIN ELK FOUNDATION'S MOTION TO INTERVENE        PAGE 1**
12231.004

I, R. Kyle Weaver, declare as follows:

1.      I am the President and Chief Executive Officer of the Rocky Mountain Elk Foundation, Inc. ("RMEF").

2.      RMEF is a nonprofit public benefit corporation incorporated in Montana, with its headquarters and principal offices and place of business in Missoula, Montana. RMEF is a charitable organization that meets the conditions of §501(c)(3) of the Internal Revenue Code.

3.      RMEF has more than 215,000 members nationwide. Among those, RMEF has over 7,000 members in Idaho, over 12,000 members in Montana, and over 7,000 members in Wyoming, over 11,000 members in both Washington and Oregon, and over 4,00 members in Utah, the states that host gray wolf populations that are the subject of this action. RMEF's members include hunters, guides, outfitters, other business owners, wildlife enthusiasts and conservationists who have both recreational and economic interests in hunting and enjoying elk and other big game.

4.      RMEF's mission is to ensure the future of elk, other wildlife, their habitat, and our hunting heritage.

5.      Since RMEF was created in 1984, it has permanently protected and enhanced more than 8.9 million acres of North America's most vital habitat for elk and other wildlife, much of which overlaps with gray wolf occupied territory. This

work includes land acquisitions, exchanges, conservation easements and improving habitat quality through stewardship projects such as prescribed burns, forest thinning, weed treatments, planting native vegetation, removing old barbed-wire fence and installing wildlife-friendly fence.

6.     RMEF has helped restore elk to their historic ranges and has worked to enhance elk habitat and populations in many areas of North America, including in the Northern Rocky Mountains.

7.     RMEF has supported more than 600 wildlife management and research projects across 33 states.  Across the greater Northern Rocky Mountains, RMEF's financial footprint for wildlife management and research exceeds $12,000,000.00, with an additional $31,000,000.00 provided by RMEF partners. These wildlife management and research projects have helped to contribute to the understanding of wildlife populations, ecology and habitat needs, including increasing understanding of gray wolf populations and genetics.  Nationally, RMEF has invested significant funds to expand the understanding of elk habitat use, nutrition, disease, genetics, population dynamics, predation, habitat management, reintroduction and economics.  Some of this research has overlapped with gray wolf occupied territories in the Northern Rocky Mountains, where researchers have looked at how predation, including predation from gray wolves, has impacted elk and other big game populations and habitat use.

8. In the Northern Rocky Mountains, RMEF and RMEF's partners helped protect more than 793,000 acres of key wildlife habitat with a conservation value over $470,000,000.00. For example, in 2022, RMEF worked with a willing seller and Montana Fish Wildlife and Parks to purchase an 829-acre property bordering the Mount Haggin Wildlife Management Area and transfer that property into state ownership for ongoing habitat protection and recreational access for the public. This purchase protects big game winter range used heavily by mule deer and elk, as well as excellent pronghorn fawning and summer range, from subdivision and development. The big game species on the property provide a prey base for predators, such as gray wolves, mountain lions and black bears, as well as opportunities for hunters and others to enjoy wildlife under management by Montana Fish Wildlife and Parks. Relisting gray wolves would remove the state's ability to manage one of the primary predators on the landscape, likely leading to greater big game mortality, and reduced opportunities for the public to hunt and enjoy big game on the property, resulting in a loss of RMEF's investment of time and resources.

9. In addition, RMEF has directly contributed over $26,600,000.00 and leveraged an additional $240,000,000.00 in state, federal and private funding to help enhance wildlife habitat on over 5,100,000 acres across the Northern Rocky Mountains. RMEF land protection and habitat enhancement efforts have directly

**DECLARATION OF R. KYLE WEAVER IN SUPPORT OF**
**ROCKY MOUNTAIN ELK FOUNDATION'S MOTION TO INTERVENE      PAGE 4**
12231.004

benefitted private, state, and federal lands in this region. For example, RMEF has been providing funding and support to the Shoshone National Forest in Wyoming for a multi-year aspen and forest restoration project that has benefited more than 12,000 elk and a wide variety of other species. Since 2016, over 82,000 acres of habitat has been improved through noxious weed treatments, aspen enhancement, prescribed burning and thinning. Nearly eight (8) miles of fencing has been removed or modified to meet wildlife-friendly specs. Relisting of gray wolves would remove critical management options for the state, leading to a significant increase in the population. With an already healthy population of wolves on the landscape, relisting would create an increase in predation pressure on struggling mule deer herds and elk populations and could shift their distribution out of areas enhanced for elk and other big game, significantly lessening the value RMEF's funding efforts on that landscape.

10.    Gray wolves have and will continue to benefit from RMEF's land protection and habitat enhancement efforts along with elk and other big game species.

11.    RMEF  has actively voiced its support of delisting gray wolves once they met the delisting criteria established by the U.S. Fish and Wildlife Service for populations in the Northern Rocky Mountains, as well as in the Great Lakes region and nationally.  RMEF has advocated for state management of gray wolves, which

is in line with RMEF's support of the North American Model of Wildlife Conservation, under which state management of wildlife has dramatically increased wildlife populations across the United States in the last 100 years. RMEF has weighed in on state gray wolf management plans in Montana, Idaho, Wyoming, Washington, Oregon and Utah. RMEF has publicly commented on legislative discussions on gray wolf management in 2016 and in 2018, and on U.S. Fish and Wildlife proposals to delist gray wolves in 2019 and on the ongoing litigation surrounding gray wolf delisting in 2022. Specific to this action, in the summer of 2021, RMEF met with the U.S. Fish and Wildlife Services and provided additional readily available information regarding the May 2021 petition to relist gray wolves that was submitted by the Center for Biological Diversity and others.

12. RMEF supports state management of wildlife, which is an essential element of RMEF's strong history of habitat conservation and enhancement in the Northern Rocky Mountains. Hunting and trapping of gray wolf populations by the public in the Northern Rocky Mountain states is just one of the tools that the wildlife agencies use to manage all big game species. RMEF's investment of time and funds on habitat protection and enhancement has been another critical tool in big game management that could be imperiled by the relisting of gray wolves.

13.    RMEF's members live, recreate and hunt elk and other wildlife, and reside in all States of the United States, including in the Northern Rocky Mountains that may be impacted by the Plaintiffs attempt to relist gray wolves which is the subject of this action.

14.    RMEF members hunt and otherwise enjoy elk, deer, bighorn sheep, and moose populations of Idaho, Montana, and Wyoming, including the local populations that are being adversely impacted by the large population of gray wolves in the Northern Rocky Mountains.  If Plaintiffs are successful in this proceeding, RMEF's members' ability to hunt and view these big game species will be adversely impacted.  In addition, some RMEF members have hunted or look forward to the opportunity to hunt, view and contribute to the conservation of gray wolves in the future.

15.    RMEF believes that delisting of gray wolves has given wildlife management agencies in the Northern Rocky Mountains the opportunity to better plan and manage big game wildlife, including the management of gray wolf populations. The delisting and state management of gray wolves has been important to RMEF's members and RMEF's investment in land protection, habitat stewardship, scientific research and our hunting heritage in the Northern Rocky Mountains and relisting them will significantly impact this.

**DECLARATION OF R. KYLE WEAVER IN SUPPORT OF**
**ROCKY MOUNTAIN ELK FOUNDATION'S MOTION TO INTERVENE          PAGE 7**
12231.004

16.     I provide this declaration in support of the Rocky Mountain Elk

Foundation's motion to intervene in this litigation.

I declare under penalty of perjury under the laws of the United States of

America that the foregoing is true and correct, as provided by 28 U.S.C. § 1746.

Executed this $2$ day of May, 2024 in Missoula, Montana.


By _____

R. Kyle Weaver, President & CEO
Rocky Mountain Elk Foundation

Hannah Stone, Esq.
Alyssa L. Campbell, Esq.
MILODRAGOVICH, DALE &
    STEINBRENNER, P.C.
620 High Park Way ▪ P.O. Box 4947
Missoula, MT 59806-4947
hstone@bigskylawyers.com;
acampbell@bigskylawyers.com
*Attorneys for Proposed Intervenors-
    Defendants Sportsmen's Alliance
    Foundation, Safari Club
    International, and Rocky Mountain
    Elk Foundation*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### MISSOULA DIVISION

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, et al, | **Lead Case 9:24-cv-00043-DWM** |
| Plaintiffs, | Member Case 9:24-cv-00044-DWM |
| and | |
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Consolidated Plaintiffs, | |
| v. | **DECLARATION OF TERRY J. WIEGAND IN SUPPORT OF ROCKY MOUNTAIN ELK FOUNDATION'S MOTION TO INTERVENE** |
| UNITED STATES FISH AND WILDLIFE SERVICE, et al., | |
| Defendants, | |
| and | |
| SPORTSMEN'S ALLIANCE FOUNDATION, SAFARI CLUB INTERNATIONAL, and ROCKY MOUNTAIN ELK FOUNDATION, | |
| Proposed Intervenors-Defendants. | |



EXHIBIT
J

**DECLARATION OF TERRY J. WIEGAND IN SUPPORT OF ROCKY MOUNTAIN ELK FOUNDATION'S MOTION TO INTERVENE**          **PAGE 1**

12231.004

I, Terry J. Wiegand, declare as follows:

1.      I am a resident of Columbia Falls, Montana, located in Flathead County. I am 56 years old.

2.      I am a general contractor and business owner.  I am also the Chief of the Volunteer Fire Department for the Blankenship Fire District. I have a degree in wildlife management and that education has given me a lifetime of interest and background in wildlife-related issues.

3.      I am the chapter chair of the Flathead Valley Chapter of the Rocky Mountain Elk Foundation ("RMEF") and a member of that State Resource Team ("SRT").  As a member of the SRT, I help ensure that chapters in the western part of Montana operate efficiently and smoothly.  I am a life member of RMEF and have been a member since 2000.

4.      I grew up in Michigan and started hunting when I was around 12, primarily for whitetail deer and turkey.  Hunting has been a part of my family's tradition for my entire life.  Through college, I partially supported myself by trapping fox, muskrat and mink.

5.      The first time I hunted elk was in Idaho in 2000, where I harvested my first bull elk.  After that, I returned to Idaho to hunt elk every year, until I eventually moved to Montana in 2010.  The area where I first hunted elk in Idaho was near the initial release of wolves for the reintroduction that happened in 1995.  After

harvesting my bull elk with archery equipment, I had a 7-mile pack-out, and was followed by wolves the entire time. At one point, the wolves came within 50 yards of me. It was a little concerning but fascinating at the same time. I hunted that area for several more years, until the wolf population grew, and the elk hunting dropped off.

6.   In addition to hunting elk, I hunt both whitetail and mule deer, prong-horn antelope, and am hoping to eventually draw a tag to hunt bighorn sheep, mountain goat, and moose. I also hunt for predators, including black bear, mountain lion, and wolves. I hunted in 2023, and plan on hunting in 2024.

7.   I started hunting wolves several years ago and enjoy spending time in the winter tracking and calling in wolves. I passed the certification class to trap wolves and have been learning new skills related to wolf trapping.

8.   Between where I live and the amount of hunting I do, I have had a lot of experience with wolves. Living near Glacier National Park, I frequently have wolves on my property and see them in the area. In both Idaho and Montana, I have heard wolves howling and seen wolves while I was hunting. I have also seen the impact that high wolf populations can have on other wildlife. I used to see cow elk calving on and near my property, but as the wolf populations have risen, they tend to move or get taken by wolves. Northwest Montana has marginal elk habitat, and wolves focus on hunting the pockets of high-quality habitat, forcing the elk to move elsewhere.

**DECLARATION OF TERRY J. WIEGAND IN SUPPORT OF ROCKY MOUNTAIN ELK FOUNDATION'S MOTION TO INTERVENE**          **PAGE 3**
12231.004

9.    I strongly believe that state management of wolves is important to maintain populations of elk and other big game. I have seen some of the best public elk hunting opportunities diminished in Idaho and Montana from unmanaged wolf populations. Management of both predators and prey is important to long-term sustainability of both on the landscape. Re-listing wolves would remove the ability to properly manage those predators by state authorities. Montana, Idaho and Wyoming have proven their capabilities to manage wolf populations.

10.    I have watched the process regarding the status of wolves, and it has been frustrating to see population goals set, and then have the goalposts moved a few years later. Re-listing wolves now, when populations seem to be high in some areas, like where I live, would really limit the tools that the states can use to manage wolf numbers as well as other wildlife. Unchecked growth of wolf populations would lead to a loss of huntable wildlife and limit my ability to enjoy hunting.

11.    Based on my observations, I do not see that the state regulations regarding wolf hunting and trapping have led to the crash of any wolf populations. I see wolves, hear howls, and see wolf sign very often where I live, and every year when I hunt elk in the fall. Wolf populations seem to be doing fine under state management and provides an additional opportunity for me and others who like to hunt. If there were no opportunities to hunt wolves, I expect the populations would

increase to the levels substantially higher than they are now, causing some large impacts on elk populations.

12.    I provide this declaration in support of the Rocky Mountain Elk Foundation's motion to intervene in this litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, as provided by 28 U.S.C. § 1746.

Executed this 2 nd day of May, 2024 in Columbia Falls, Montana.

By _____
Terry Wiegand